Rhys A. WILLIAMS, M.D., Plaintiff,

v.

AMERICAN BROADCASTING COMPANIES, INC., Defendant.

Hazel DAVIDSON, Plaintiff,

v.

Peter LANCE, Antoine Wilson and ABC Companies, Inc., Defendants.

Civ. Nos. 82–5180, 82–5179.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Feb. 9, 1983.

William H. Trice, III, Howell, Price & Trice, Little Rock, Ark., and Gene Campbell, Walker, Campbell & Young, Harrison, Ark., and W.B. Putman, Putman, Gallman & Dickson, Fayetteville, Ark., for plaintiffs.

Robert K. Walsh and William H. Sutton, of Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

#### I. *Introduction*

The instant cases are before the Court pursuant to certain motions to compel filed by plaintiffs, Dr. Rhys A. Williams and Hazel Davidson, in the above-styled consolidated cases. Plaintiffs seek to compel the production of "out-takes" of film or video-tape photographed in the production of a segment of the American Broadcasting Companies, Inc., network program, "20/20," first broadcast on January 8, 1981. The subject of the segment concerned allegedly unnecessary surgery in the medical profession. It is the broadcast of the edited film or video-tape which is the subject matter of the two consolidated cases now before the Court.

On April 14, 1981, plaintiff, Hazel Davidson, filed an action in the Circuit Court of Boone County, Arkansas, alleging that defendants, Peter Lance, Antoine Wilson and American Broadcasting Companies, Inc. ("ABC"), willfully caused her prosthetic hip surgery at Boone County Hospital to be filmed or video-taped, for profit, without her knowledge or consent, and thereby invaded her privacy.

On May 19, 1981, defendants removed the action to this Court pursuant to 28 U.S.C. § 1446. An amended complaint was filed on December 21, 1982, which did not substantially alter the issues.

Plaintiff, Dr. Rhys Williams, instituted this action against defendant ABC in the Circuit Court of Boone County, Arkansas, on June 18, 1981. The action was removed to this Court on July 16, 1981.

Dr. Williams alleged that agents and employees of ABC "defamed" his character by broadcasting editorially-created implications that Dr. Williams routinely performed unnecessary surgery, was guilty of malpractice in approximately sixty cases as a result of which eight persons died, was generally incompetent, and constituted a threat to the lives of his patients.

Dr. Williams also alleged that ABC filmed an "ambush" interview with him on June 24, 1980, in which Dr. Williams refused to answer questions and purposely invaded his privacy by publishing his refusal and thereby placed him in a "false light" before the public.

Dr. Williams seeks damages in excess of fifty-three million dollars.

In both cases the defendants asserted that their conduct was privileged under the First Amendment and that all information broadcast was true. In the case of Hazel Davidson, defendants alleged that all of their activities were conducted pursuant to implied consent.

On December 21, 1982, plaintiffs moved this Court to compel ABC to produce the "out-takes" of all film or video-tape produced in the course of ABC's "investigation."

Defendants responded, alleging that the "out-takes" are privileged under the First Amendment, and that the law of the State of New York with respect to a reporter's privilege would preclude the production of the "out-takes."

At the outset the Court notes that plaintiffs failed to comply with Local Rule 20 (Rule 20 of the Rules of the United States District Courts for the Eastern and Western Districts of Arkansas) by omitting a brief in support of the motions. As the Court noted in its letter to the parties on December 28, 1982, consideration was given to merely denying the motions for failure to comply with Rule 20, but because of the lateness of the motions and the tremendous importance of the issues raised, the Court felt that it was necessary to resolve the issues prior to trial.

On December 28, 1982, an Order was entered granting plaintiffs' motions to com-

pel. To set forth in detail the basis of the Court's conclusions, the Court issues this Memorandum Opinion.

## II. *Discussion*

### (A) The Non-Constitutional Reporter's Privilege

Initially the Court notes that plaintiffs do not seek to compel the disclosure of any informants, sources, or source material for the broadcast segment involved. Plaintiffs seek merely the production of all film or video-tape "shot" but not used in the "unnecessary surgery" segment.

Defendants do not assert that discovery of the requested out-takes would disclose a source, confidential or otherwise, or would require the disclosure of protected materials such as affidavits, reports, statements, or other materials along this vein.

The defendants argue that the Court should protect the defendants against disclosure of its "editorial decisions on which information to publish, regardless of whether the information is derived from confidential or non-confidential sources." (Defendants' Brief, p. 2.)

At this point it is relevant to note the allegations of the complaints filed herein. In paragraph 4 of the complaint of plaintiff, Dr. Rhys Williams, it is alleged that the "defamatory remarks" were comprised of "editorially created implications." In paragraph 5, Dr. Williams alleged that "selective editorial procedures employed by Defendant gave a distorted, false and biased description of the results of the so-called 'investigation'." In paragraph 7, it is alleged that favorable "information was deliberately ignored by defendant and omitted from its broadcast."

The complaint further alleges that "the said publication was made by Defendant with malice and with the actual knowledge that the false and defamatory remarks and implications were false and defamatory and not privileged and made with the intent to injure plaintiff in his profession and to bring him into public disrepute, or were made by Defendant knowingly, willingly and with utter disregard of the truth or falsity of such remarks ..."

Obviously, then, the crux, the entire gist, of Dr. Williams' claim is that ABC purposely or recklessly, through selective editing of the tape or film, created false and biased impressions of plaintiff's integrity and competence in his profession.

Therefore, it can hardly be seriously argued that the out-takes are not "relevant to the subject matter involved in the pending action," nor that the out-takes do not appear "reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1), Fed.R.Civ.P.

Thus, under the controlling principles of Rule 26(b)(1) governing the scope of discovery,[1] it appears that the only conceivable impediment to the discovery of the out-takes is the possible existence of a privilege.

As a matter of pure "evidence" law, the subject of privileges is covered in Rule 501, Fed.R.Evid. Rule 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, state, or political subdivision thereof, shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of a witness, person, government, state, or political subdivision thereof, shall be determined in accordance with state law.

It is undisputed that the instant actions are civil actions "with respect to an element of a claim or defense as to which state law supplies the rule of decision." Accordingly, any "reporter's or journalist's privilege" must exist by virtue of state law or Constitutional mandate.

---

1. Rule 26(b)(1) provides: "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action, . ." (emphasis ours.)

■ The question has arisen that, in determining the existence of such a privilege under state law, to which state's laws must we look in this case? Under the principle of *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this Court must apply the choice-of-law rules of the State of Arkansas.

Defendants argue that privilege laws are "witness-protective and defendant-protective" while substantive libel laws are plaintiff-protective. Thus, defendants urge, under the "governmental interest" test for choice of law decisions adopted by the Arkansas Supreme Court in *Wallis v. Mrs. Smith's Pie Co.,* 261 Ark. 622, 550 S.W.2d 453 (1977), the Arkansas courts would find the law of the State of New York to be controlling on the issue of the existence of a newsman's privilege, because all defendants are citizens of New York, all editorial decisions are made in New York, all broadcasts originate in New York, and because it would be unfair to subject network reporters broadcasting nationwide to the varying privilege laws of fifty states.

N.Y.Civ.Rights Law § 79–h(b), c. 615, (McKinney 1970), provides, in substance, that a professional journalist shall not be judged in contempt of court for "refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication...."

■ Whether New York law would extend this privilege to the actual situations presented in the instant cases is a question we need not decide. The law of the State of Arkansas, in accordance with the general rule, is that the competency and admissibility of evidence are to be determined by the law of the forum state. *Brotherhood of Rd. Trainmen v. Long,* 186 Ark. 320, 53 S.W.2d 433 (1932); *Kansas City So. Ry. Co. v. Leslie,* 112 Ark. 305, 167 S.W. 83 (1914); 29 Am.Jur.2d *Evidence* § 6, p. 39. Thus, the Arkansas courts would look to the Arkansas substantive law governing privileges, and so must we. *Klaxon, supra.*

The subject of privileges is covered in Article V of the Arkansas Uniform Rules of Evidence.

Rule 501 of these rules provides:

*Rule 501. Privileges recognized only as provided.—*

Except as otherwise provided by constitution or statute or by these or other rules promulgated by the Supreme Court of this State, no person has a privilege to:

(1) refuse to be a witness;

(2) refuse to disclose any matter;

(3) refuse to produce any object or writing; or

(4) prevent another from being a witness or disclosing any matter or producing any object or writing.

Rules 502 through 509 list the specific privileges now recognized in the State of Arkansas. Rule 502 governs the lawyer-client privilege; Rule 503 delineates the scope of the physician and psychotherapist-patient privilege; Rule 504 provides the husband-wife privilege; Rule 505 governs the "religious" privilege; Rule 506 guarantees the sanctity of political vote; Rule 507 protects trade secrets; Rule 508 governs state secrets and governmental privileges; and Rule 509 protects the identity of governmental informers.

Nowhere in these rules is there any mention of a "newsman's privilege." In fact, as noted, Rule 501 clearly negates the existence of any privilege not granted by the Arkansas Constitution or by statute or Supreme Court rule.

The only statutory authority for such a privilege is Ark.Stat.Ann. § 43–917. Ark. Stat.Ann. § 43–917 provides:

Before any editor, reporter, or other writer for any newspaper or periodical, or radio station, or publisher of any newspaper or periodical or manager or owner of any radio station, shall be required to disclose to any Grand Jury or to any other authority, *the source of information used as the basis for any article he may have written, published or broadcast,* it must be shown that such article was writ-

ten, published or broadcast in bad faith, with malice, and not in the interest of the public welfare (emphasis ours).

In *Saxton v. Arkansas Gazette Co. and Griffee,* 264 Ark. 133, 569 S.W.2d 115 (1978), the Arkansas Supreme Court recognized Ark.Stat.Ann. § 43–917 as the only state authority for a news reporter's privilege:

Significantly, in both *Branzburg (v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)) and *Caldero (v. Tribune Pub. Co.,* 98 Idaho 288, 562 P.2d 791 (1977)), it was noted that a number of states, including Arkansas, have provided editors and news reporters with a statutory privilege. (Referring to § 43–917.)

Although the Court concluded that the section 43–917 privilege extends to civil proceedings as well as criminal proceedings, it is clear that no other statutory or state common law privilege has ever been recognized in the State of Arkansas.

It is now universally conceded that there was no journalist's privilege at common law. 23 Wright & Graham, Federal Practice and Procedure: Evidence § 5426, p. 716. Thus, the journalist's privilege in state courts, apart from Constitutional considerations, has existed by virtue of statute or not at all.[2]

Notwithstanding this historical fact, the Court of Appeals for the Third Circuit "concluded" that journalists have a federal common law privilege to refuse to divulge their sources. *Riley v. City of Chester,* 612 F.2d 708 (3rd Cir.1979). This conclusion was based in part on Rule 501, Fed.R.Evid.:

The legislative history of Rule 501 manifests that its flexible language was designed to encompass, *inter alia,* a reporter's privilege not to disclose a source. The original draft of the Rule defined nine specific non-constitutional privileges, but failed to include among the enumer-

ated privileges one for a reporter or journalist. The Advisory Committee gave no reason for the omission. This was one of the primary focuses of the congressional review of the proposed evidentiary rules, stemming in part from the "nationwide discussions of the newspaperman's privilege." Following testimony on behalf of groups such as the Reporters Committee for Freedom of the Press, the privilege rule was revised to eliminate the proposed specific rules on privileges and to leave the law of privilege in its current state to be developed by the federal courts.

*Riley, supra,* at p. 714.

In other words, the Third Circuit reasoned that because the newsman's privilege was not included in the original list of privileges in the proposed rule, and because the nine enumerated privileges were later deleted, this shows an ultimate desire for the Courts to develop such a privilege.

Defendants cite several cases for the proposition that out-takes of reporter interviews are privileged, regardless of the existence of confidential sources.

In *United States v. Cuthbertson,* 630 F.2d 139 (3rd Cir.1980), the Court, relying upon *Riley,* reaffirmed the existence of a federal common law privilege for newsmen, and extended it to out-takes sought in a criminal case.

We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes (citations omitted). Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foun-

---

**2.** *See* Alaska Stat. §§ 09.25.150, 09.25.160, 09.-25.170, 09.25.220, 09.25.210; Ariz.Rev.Stat. Ann. § 12–2237; Ark.Stat.Ann. § 43–917; Cal. Const., Art. I, § 2(b); Cal.Evid.Code § 1070; 10 Del.Code § 4320 *et seq.;* Mich.Stat.Ann. § 28.945(1) [M.C.L.A. § 767.5a]; Minn.Stat. Ann. § 595.021 *et seq.;* Mont.Rev.Code § 93-601 -2; Neb.Rev.Stat. § 20–144 *et seq.;* Nev.

Rev.Stat. § 49.275; N.J.Stat Ann. § 2A:84A-21; N.D.Cent.Code § 31–01–06.2; Ohio Rev. Code Ann. § 2739.11; 12 Okla.Stat.Ann. § 2506; 42 Pa.Cons.Stat.Ann. § 5942. There is abundant literature on the subject. *See* Yarbrough, Press Privilege Claims and Balancing Doctrine, 31 Ala.L.Rev. 523 (1980).

dation of the privilege. *See Riley v. City of Chester, supra.* Therefore, we hold that the privilege extends to unpublished materials in the possession of CBS. *See Altemose Construction Co. v. Building & Construction Trades Council,* 443 F.Supp. 489, 491 (E.D.Pa.1977) ("this qualified privilege can even apply when the news source and, perhaps, a portion of the withheld writing, are not confidential").

*Cuthbertson, supra,* at p. 147.

In *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3rd Cir.1980), the Third Circuit, in interpreting Pennsylvania's shield law, concluded that:

> Inasmuch as (*In re*) *Taylor,* 412 Pa. 32 [193 A.2d 181] (1963), protects all non-published portions of a source's statement, we hold that the out-takes of the Mills interview are protected even though the identity of the primary source of information is known.

For obvious reasons, *Riley, Cuthbertson* and *Steaks Unlimited* are not authority for the existence of a nonconstitutional newsman's privilege applicable to this case. *Riley* was an expansion or creation of the federal common law, as was *Cuthbertson. Steaks Unlimited* involved an application of Pennsylvania's shield law and state case law thereunder.

Perhaps the strongest argument for the existence of a nonconstitutional privilege arguably applicable to these actions is, however, based upon *Steaks Unlimited.*

In *Steaks Unlimited,* the Third Circuit relied upon decisions of the Pennsylvania Supreme Court which interpreted Pennsylvania's "shield" law.  42 Pa.Cons.Stat. § 5942(a) (Supp.1979), provides:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any maga-

zine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such persons, in any legal proceeding, trial or investigation before any government unit.[3]

As noted, this is similar but not identical to Ark.Stat.Ann. § 43–917 quoted above.

In *Taylor, supra,* and *Hepps v. Philadelphia Newspapers, Inc.,* Pa.D. & C.3d 693 (1977) (Court of Common Pleas), the Pennsylvania courts have made clear that "regardless of the reason, a reporter need not disclose those portions of an informant's statement [not actually published], whether or not the identity of the informant is disclosed." *Hepps,* at p. 705. Under *Hepps* and *Taylor,* out-takes are protected under Pennsylvania's shield law, regardless of whether a "source" is involved, and regardless of "confidentiality" of the information.

Thus, the argument naturally arises that the Arkansas Supreme Court would interpret section 43–917 to protect out-takes, as the Pennsylvania courts have interpreted 42 Pa.Cons.Stat.Ann. § 5942 to do so.

To date, the only Arkansas case interpreting section 43–917 is *Saxton.* In *Saxton,* the Arkansas Supreme Court merely interpreted section 43–917 so as to apply equally in civil and criminal proceedings. Therefore, this Court must make an "*Erie*[4] leap" in determining the manner in which the Arkansas courts would handle the factual situation presented here.

Under Arkansas law, the courts, in construing a statute, must assume that the Legislature employed the words of the statute in their most usual and common meaning.  *Ouachita Power Co. v. Donaghey,* 106 Ark. 48, 152 S.W. 1012 (1912); *Arkansas State Highway Com'n v. Mabry,*

---

**3.** This is a recodification of the prior shield law in effect at the time of trial in *Steaks Unlimited,* 28 Pa.Stat.Ann. § 330 (1953). The official source note accompanying § 5942 states that the new statute is "substantially a reenactment" of § 330.  § 330 as enacted in 1937 applied only to the written press, however, the

Pennsylvania Supreme Court had interpreted the statute so as to protect radio and television stations. *In re Taylor,* 412 Pa. 32, 41 n., 193 A.2d 181, 185 n. 4 (1963).

**4.** *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

229 Ark. 261, 315 S.W.2d 900 (1958). It is only when a statute is ambiguous and there is doubt as to its meaning that Arkansas courts will resort to extrinsic matter to shed light on the legislative intent. *Britt v. State,* 261 Ark. 488, 549 S.W.2d 84 (1977). A statute will not be construed so as to overrule a principle of the common law unless it is clear that such a change is intended. *Starkey Const., Inc. v. Elcon,* 248 Ark. 958, 457 S.W.2d 509 (1970). A statute at variance with the common law must be strictly construed. *Grimmett v. State,* 251 Ark. 270–A, 476 S.W.2d 217 (1972); *Wright v. Wright,* 248 Ark. 105, 449 S.W.2d 952 (1970).

■ With these established rules of construction in mind, the language of the statute itself will be examined.

> Before any (newsperson) shall be required to disclose to any grand jury or to any other authority the *source* of information used as the basis (for any publication or broadcast) it must be shown that the (publication or broadcast) was ... published or broadcast *in bad faith, with malice, and not in the interest of the public welfare* (emphasis ours).

Ark.Stat.Ann. § 43–917.

The Arkansas Supreme Court has never expanded this statute beyond its plain meaning. In *Saxton,* the Court interpreted the words "or to any other authority" as evidence of legislative intent that civil proceedings be covered as well as criminal proceedings, obviously because it makes little sense to invoke an evidentiary privilege against both sides in a criminal proceeding, where the need for all accurate and relevant information in the protection of an accused is great, which is not applicable in civil proceedings. We have no trouble with this construction.

Nor do we have any doubt that the section 43–917 privilege would be extended to television reporters as well as radio reporters.[5]

However, the statute, by its own terms, applies only so as to protect "the source." Further, the source is not protected in the event of bad faith or malice on the part of the reporter. Plaintiffs do not seek any information as to sources. Defendants do not even assert that the out-takes would lead to the discovery of a source. Plaintiffs have alleged, and presumably stand prepared to attempt to prove bad faith or malice on the part of defendants.

Although similar to section 43–917, 42 Pa.Cons.Stat.Ann. § 5942 expressly extends to "editing,"[6] and makes no exception for malicious reporting.

These differences are substantial, especially in light of Arkansas' well-established rules of construction, noted above. Therefore, we conclude that the Arkansas courts, if faced with the precise "out-take" situation present here, would hold that section 43–917 does not protect out-takes in a libel or privilege case, which would not in any respect reveal a source.

■ In this regard we are persuaded that the Arkansas courts would be guided by precedent in which other courts have held that the newsman's privilege, if any, whether based upon common law or the First Amendment, must give way, even as to confidential sources, in a libel case where such is necessary for a plaintiff to establish actual malice or reckless disregard of the truth on a given defendant's part. *See Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir.1980); *Carey v. Hume,* 492 F.2d 631 (D.C.Cir.1974).

We are aware that the Arkansas Supreme Court has been zealous in the protection of the rights of the press. *See, for example, Pritchard v. Times Southwest Broadcasting,* 277 Ark. 458, 642 S.W.2d 877 (1982). However, we are also convinced that the Arkansas courts are fully aware of the history of the asserted privilege.

---

**5.** The 1949 amendment, the latest revision, added the words "or radio station" following "or periodical"; inserted "or manager or owner of any radio station" following the second "or periodical"; inserted "or broadcast" following

"written, published"; inserted "or broadcast" again following "written, published."

**6.** *See* note 3, *supra.*

The first reported case occurred in 1848 when a reporter was jailed for contempt of Congress for refusing to disclose the identity of a person who had obtained a copy of the secret draft of the proposed peace treaty which would have ended the Mexican-American War. *Ex Parte Nugent,* 18 F.Cas. 471 (C.C.D.C.1848). In 1857, a New York Times reporter was jailed for refusing to reveal the names of members of the House of Representatives who had "leaked" names of Congressmen who had accepted bribes. *See Hearings on Senate Bill 36,* pp. 591–92. Similar conflicts are legion up to the era of the Great Depression. *See* Note, *Newsman-Source Privilege: A Foundation in Policy for Recognition at Common Law,* 26 U.Fla.L.Rev. 453 (1974); Note, *The Right of a Newsman to Refrain from Divulging the Sources of His Information,* 36 Va.L.Rev. 61 (1950).

Nonetheless, as Professors Wright and Graham note, "the need for a testimonial privilege did not receive much attention until the turbulent era of the Depression when stories on municipal corruption and labor unrest brought reporters to the witness stand." 23 Wright & Graham, Federal Practice and Procedure: *Evidence* § 5426, p. 715.

The best known of the episodes, according to Professors Wright and Graham, arose in 1936 from a series of articles on the rackets in New York City which ultimately led to the appointment of Thomas E. Dewey as special prosecutor.[7]

Numerous legal theories were advanced to justify refusal to disclose, including breach of journalistic ethics, violation of employers' regulations, uncompensated taking of proprietary interest in information, self-incrimination, relevancy, and the First Amendment. *See* D'Alemberte, *Journalists Under the Axe: Protection of Confidential Sources of Information,* 6 Harv.J. on Legis. 307 (1969).

As Wright and Graham note:

None of these arguments found much favor with the courts; it is now universally conceded that there was no journalists' privilege at common law. This was true, not only in this country, but in other nations in which the English common law prevailed.

Wright & Graham, *supra,* at p. 716.

Thus, by the turn of the century it was well established that recognition of such a privilege was a task for the legislatures. Maryland enacted one such statute in 1898, and New Jersey next followed suit 33 years later, in 1931. By 1973 half of the states had enacted such legislation.

Nonetheless, the legal profession has generally sided with opponents of the privilege. Wright & Graham, *supra,* at p. 725. The scholarly writers found no justification for such a privilege. *See* 8 Wigmore, Evidence § 2286. The ABA has consistently opposed the privilege. *See* 63 A.B.A. Rpts. 570 (1938); 60 A.B.A.J. 707 (1974). Neither the Uniform Rules of Evidence nor the Federal Rules of Evidence include such a privilege for state or federal courts. *See* Article V of Fed.R.Evid.; Uniform Rules of Evidence.

Not until 1958, some nine years following the latest revision of section 43–917, was such a privilege, in the absence of statute, recognized anywhere. This recognition was founded upon the First Amendment. *See Garland v. Torre,* 259 F.2d 545 (2d Cir.1958), wherein the Court seemed ready to accept the concept that compelled disclosure of confidential sources may have a "chilling effect" on First Amendment rights. *Garland v. Torre, supra,* at p. 548.

It was not until near the close of the 1970's, following the adoption of the Federal Rules of Evidence, that courts began to "recognize" a "common-law" privilege, *see Cuthbertson* and *Riley, supra,* although it is unclear whether this sudden recognition involves a nonconstitutional, policy-oriented evidence rule or evolving principles of constitutional law.

Accordingly, we are convinced that, in light of the history of the privilege, and in light of Arkansas' long-settled principles of statutory construction, no nonconstitutional

---

7. *People ex rel. Mooney v. Sheriff,* 269 N.Y. 291, 199 N.E. 415 (1936).

privilege which would preclude discovery of the "out-takes" at issue here would be recognized by the Arkansas courts. This being the case, we are not free to "invent" one. Fed.R.Evid. 501; *Erie, supra.*

### (B) The Constitutional Privilege

In *Garland v. Torre, supra,* at p. 548, the Court of Appeals for the Second Circuit said:

As to the Constitutional issue, we accept at the outset the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgment of press freedom by imposing some limitation upon the availability of news.

Further:

If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it, too, must give place under the Constitution to a paramount public interest in fair administration of justice.

*Id.* at 549.

The Court concluded that "the Constitution conferred no right to refuse an answer," *id.* at 550, because the Court was not faced "with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance or materiality." *Id.* at 549–50.

Nonetheless, state courts continued to reject the First Amendment argument. Wright & Graham, *supra,* p. 735.

In *Caldwell v. United States,* 434 F.2d 1081 (9th Cir.1970), the Ninth Circuit held that a reporter for the New York Times who had gained the confidence of the Black Panther Party could not be required to answer grand jury questions or even appear, because, the Court reasoned, his informants would lose confidence in him and he would no longer be able to report on their activities and attitudes. The Court adopted the test promulgated by Mr. Justice Stewart (then Judge) in *Torre:* "[W]hether the interest to be served by compelling the testimony of the witness in the present case justifies the impairment of this First Amendment freedom." *Caldwell, supra,* at p. 1087, n. 6.

The issue of the existence of a First Amendment reporter's privilege was "resolved" by the Supreme Court in 1972 in three consolidated cases, one of which was the appeal of the Second Circuit's *Caldwell* decision. The cases were decided together as *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

Mr. Justice White, for the Court, said: "We are asked to create another (privilege) by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do." *Branzburg, supra,* at p. 690, 92 S.Ct. at p. 2661.

Notwithstanding the clear language of Mr. Justice White, courts immediately began to distinguish *Branzburg.* In *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), the Eighth Circuit declared:

We are aware of the prior cases holding that the First Amendment does not grant to reporters a testimonial privilege to withhold news sources. But to routinely grant motions seeking compulsory disclosure of anonymous news sources without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of state libel laws.

Referring to *Branzburg,* the Eighth Circuit said:

The Court (in *Branzburg*) was not faced with and, therefore, did not address, the question whether a civil libel suit should command the quite different reconciliation of conflicting interests pressed upon us here by the defense.

*Cervantes, supra,* at p. 993, n. 9.

Since Mr. Justice Powell's three-paragraph concurrence was needed to make up the majority in *Branzburg,* some courts felt that it was controlling, and it was read as upholding the existence of at least a quali-

fied First Amendment privilege along the lines of *Garland.* *See Branzburg, supra,* 408 U.S. at pp. 709–710, 92 S.Ct. at pp. 2670–71 (Powell, J., concurring).

The Supreme Court remained largely silent throughout this period of uncertainty as to the application of *Branzburg.* Not until 1979 did the Court address a similar issue. In *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Supreme Court held that when a member of the press is alleged to have circulated damaging falsehood and is sued for injury to the plaintiff's reputation, there is no privilege under the First Amendment's guarantees of freedom of speech and freedom of the press barring the plaintiff from inquiring into the editorial processes of those responsible for the publication where the inquiry will produce evidence material to the proof of a critical element of the plaintiff's cause of action. Said the Court:

> This is not to say that the editorial discussions or exchanges have no constitutional protection from casual inquiry. There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false.

The Chief Justice, Mr. Justice Blackmun, Mr. Justice Rehnquist and Mr. Justice Stevens joined in Mr. Justice White's opinion in *Lando.* Mr. Justice Powell joined and specially concurred. Thus, a clear majority negated the existence of a constitutional editorial privilege to refuse to disclose the editorial processes, in a libel case, which are relevant to the proof of an element of the plaintiff's cause of action.

Notwithstanding the clear holding of *Lando,* several federal courts persisted in applying the three-prong test of *Garland:* (1) is the information relevant; (2) can the information be obtained by alternative means; and (3) is there a compelling interest in the information. *See Miller, supra,* at p. 726; *Cuthbertson, supra; Los Angeles Memorial Coliseum Com'n v. N.F.L.,* 89 F.R.D. 489 (C.D.Calif.1981); *Mize v. McGraw-Hill, Inc.,* 82 F.R.D. 475 (S.D.Tex. 1979).

Justice White's majority opinion in *Branzburg* was adopted without reservation by Justices Blackmun, Rehnquist and the Chief Justice, with Justice Douglas among the dissenters. Justice White's majority opinion in *Lando* was adopted without reservation by Justices Blackmun, Rehnquist, Stevens and the Chief Justice. Inasmuch as Mr. Justice Stevens was appointed in the interim to fill the vacancy created by the departure of the distinguished late Justice Douglas, we think that it is highly probable that the majority opinion in *Branzburg* would now command a clear majority.[8]

█ With the majority opinions of *Branzburg* and *Lando* as our guide, it is clear that with respect to editorial decisions and processes the test is whether the requested information is a matter of simple "curiosity" or some nebulous concept such as the "public interest," or whether it is a genuine matter involving a specific claim of injury resulting from malicious defamation or invasion of privacy. Since "source" material is not at issue in the instant case, we decline to reformulate the holding of *Branzburg,* as it speaks for itself.

With this in mind, we must now examine the private civil interests involved in this and similar litigation in light of *Lando* and its principles.

Plaintiff Hazel Davidson asserts a claim of intentional "invasion of privacy." As Professor Prosser points out, there are at least four distinct manners of "invasion of privacy" and each involves the infringement of a distinct privacy interest.

8. We note that although Justice O'Connor has filled the vacancy created by the retirement of Justice Stewart, this does not affect our conclusion in this regard, as Justice Stewart dissented in both *Branzburg* and *Lando.*

■ One of the torts constituting an invasion of privacy consists of intrusion upon the plaintiff's physical solitude or seclusion. This tort requires actions on the defendant's part in the nature of prying or intrusion which is offensive or objectionable to a reasonable person. The "thing" into which there is intrusion or prying must be, and be entitled to be, private. As Prosser notes, "when the plaintiff is confined to a hospital bed, and in all probability when he is merely in the seclusion of his home, the making of a photograph is an invasion of a private right, of which he is entitled to complain." Prosser, *The Law of Torts* § 112, ch. 22. *See also* Note, *Crimination of Peeping Toms and Other Men of Vision,* 5 Ark.L.Rev. 388 (1951).

■ A second tort constituting an invasion of privacy is what is termed the "public disclosure of private facts." This tort recognizes a cause of action in publicity, of a highly objectionable kind, given to private information about a plaintiff even though it is true and no defamation action would lie. One example is the public disclosure of medical pictures involving intimate anatomy of the plaintiff. *See Banks v. King Features Syndicate,* 30 F.Supp. 352 (S.D.N.Y.1939); Prosser, *supra.*

■ The third form of invasion of privacy consists of publicity which places the plaintiff in a false light in the public eye. The false light need not be defamatory, although it often is, but it must be such as to be offensive or objectionable to a reasonable person. *Dodrill v. Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979); *Strickler v. NBC,* 167 F.Supp. 68 (S.D.Cal. 1958).

The fourth tort in the group consists of the appropriation for benefit or advantage of the plaintiff's name or likeness.

As Prosser notes, "it is the failure to recognize (that these four forms of invasion of privacy are distinct and based on different elements) which has been responsible for much of the apparent confusion in the decisions." Prosser, *supra. See Ettore v. Philco Television Broadcasting Co.,* 229 F.2d 481 (3rd Cir.1956).

Intrusion and disclosure require the invasion of something secret, secluded or private; false light and appropriation do not. Disclosure and false light depend upon publicity while intrusion and appropriation do not. False light requires falsity or fiction while none of the other three do. Appropriation requires a use for defendant's advantage while the other three do not.

■ Hazel Davidson's claim can be construed as involving intrusion, possible disclosure, and an intent to appropriate. Dr. Williams' claim involves false light.

It is clear that in false light cases, akin to defamation, wherein the false light is allegedly the result of selective editing, outtakes of film would be highly probative and in many cases the only proof of selective editing. In intrusion cases, out-takes could be relevant, but not crucial, necessarily, to proof of the fact of invasion and the extent of it. In disclosure and appropriation cases, the gist of the tort is defendant's use for his or her benefit or actual disclosure. In these cases, out-takes would not necessarily be particularly relevant.

As both plaintiffs allege an invasion of privacy wherein the out-takes are either crucial or highly relevant to the causes asserted, and as both seek punitive damages for maliciousness or intentional invasion of these rights, the out-takes are clearly discoverable, as they involve "a specific claim of injury arising from a publication" or investigation "that is alleged to have been knowingly or recklessly false" or intentionally and maliciously conducted. *Lando, supra.* In no event can the disclosure sought here be said to be a matter of mere "satisfaction of curiosity."

Dr. Williams' count for libel is exactly the type of situation addressed in *Lando,* and we think it is controlled thereby.

The defendants assert a privilege from disclosure of its "editorial decisions on which information to publish, regardless of whether the information is derived from confidential on nonconfidential sources." (Defendants' Brief, p. 2).

In *Lando,* the Supreme Court held that when a member of the press is alleged to have circulated falsehood and is sued for injury to the plaintiff's reputation, there is no privilege which prevents the plaintiff from inquiring into the editorial processes, where the inquiry will produce evidence material to the proof of a critical element of the cause of action.

Otherwise, of course, "malice" would be practically impossible to prove. The privilege asserted by defendants would effectively erect a constitutional barrier to *any* libel suit by *any* public figure against *any* member of the press because "malice," *i.e.,* knowing or reckless disregard of the truth is constitutionally required in such cases. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1328, 20 L.Ed.2d 262 (1968). Non-"public figures" could likewise never recover punitive damages for even intentional falsehood on the part of any member of "the press," and states would thus be powerless to "deter" such reprehensible conduct, being relegated to awarding only compensatory damages. And to the extent that evidence as to the editorial processes may be probative of negligence or "fault" short of "malice" on the part of the news media, defamation actions against any member of the press would be seriously jeopardized, because the states are constitutionally prohibited from imposing liability without fault in such cases. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The concept advanced by defendants is totally "at odds" with the principle that malicious libelous utterances are not constitutionally protected.

Only Justices Black and Douglas have advanced the idea that states may not enforce libel and slander laws because of the constraints of the First Amendment. *See Sullivan, supra,* 376 U.S. at p. 254, 84 S.Ct. at p. 710 (Black, J. and Douglas, J., concurring). Defendants' argument would put us perilously close to such a position, which has never had any judicial recognition, at least where the press is involved, and we are not willing to encroach upon the states' power to formulate and enforce tort law beyond that degree of encroachment absolutely required by present constitutional interpretation.

For the foregoing reasons, plaintiffs' motions to compel are well-taken. A separate order in accordance herewith was entered on December 28, 1982.