504 A.2d 211

George HATCHARD and Mt. Pocono AMC/Jeep, Inc.

v.

WESTINGHOUSE BROADCASTING COMPANY and KYW–TV 3, Appellants.

Zigmond LEFKOSKI, Jr.

v.

NEP COMMUNICATIONS, INC.

Appeal of NEP COMMUNICATIONS, INC., t/d/b/a WNEP–TV News.

Superior Court of Pennsylvania.

Argued Aug. 6, 1985.

Filed Jan. 24, 1986.

1

2

Steven B. Feirson, Philadelphia, for Westinghouse, appellants, (at 2219).

Bruce Morgan, Scranton, for NEP, appellant, (at 1056).

Keith S. Erbstein, Philadelphia, for Hatchard, appellee (at 2219).

Charles J. Bufalino, Jr., Pittston, for Lefkoski, appellee (at 1056).

Before SPAETH, President Judge, and WICKERSHAM, BROSKY, ROWLEY, WIEAND, CIRILLO, OLSZEWSKI, BECK and TAMILIA, JJ.

SPAETH, President Judge:

Two appeals, which we consolidated and heard together, are before us. In one appeal, the trial court granted appellee Lefkoski's motion to compel production of a reporter's notes and other documentary material, as well as filmed "outtakes;"[1] in the other the trial court granted appellee Hatchard's motion to compel production of outtakes, but denied his request for other documentary material. Appellants argue that these orders are erroneous because all the material is privileged under the Pennsylvania Shield Law, 42 Pa.C.S. § 5942(a),[2] as construed in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963). We agree with appellants that under *Taylor* the orders before us must both be reversed. This result, in our opinion, is unjust. The law has changed a good deal since *Taylor* was decided, and we believe those changes warrant reconsideration of *Taylor*. Such reconsideration, however, is not appropriate to our role as an intermediate appellate court. If it is to occur, it must be by the Supreme Court; or the Legislature

1. "Outtakes" are films or videotaped material prepared for a television broadcast but not shown in the version of the program broadcast to the public.

2. Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S. § 5942(a). This act, as the comment to it notes, substantially reenacts Act of June 25, 1937, P.L. 2123, No. 433, § 1, as amended Dec. 1, 1959, P.L. 1669, § 1, as amended July 31, 1968, P.L. 858, § 1, 28 Pa.C.S. § 330.

may amend the Shield Law. Meanwhile, we are bound by *Taylor*. Both orders, therefore, will be reversed.

On November 7, 1979, appellees George Hatchard and Mount Pocono AMC/JEEP, Inc., ("Hatchard") sued appellants Westinghouse Broadcasting Company and KYW–TV ("KYW"), alleging that certain investigative reports broadcast in January and March 1979 defamed them. The reports, entitled "Wheeling and Dealing with City Hall," and "Follow to Wheeling and Dealing with City Hall," concerned the sale of millions of dollars worth of automobiles to the City of Philadelphia. In preparing the reports, the investigative team had videotaped interviews with Hatchard, as well as with numerous officials of the city government. On July 23, 1981, Hatchard filed the Motion to Compel the Production of Documents that is at issue here.[3] The motion sought: (1) all tapes, film, transcripts and other documentary material prepared by KYW during its investigation of Hatchard, but "excluding any such material that would reveal the identity of your sources pursuant to 42 Pa.C.S. § 5942;" and (2) all tapes, film and other documentary material prepared during KYW's interviews with Hatchard, and with eleven other named interviewees. Hatchard specified, however, that "in responding to [this request KYW] can exclude material referred to by those individuals which would, in turn, reveal the source of other material [KYW] deemed[ed] privileged." Motion to Compel, filed July 23, 1981. KYW opposed the motion, claiming, in part, that the Pennsylvania Shield Law protected doc-

3. Hatchard's initial request for the production of documents was filed on November 16, 1979, and requested substantially the same material that is at issue in the present appeal, that is, all documentary material, tapes, and films prepared by KYW in the course of its investigation. After KYW objected to this request, claiming that the material was privileged under the Pennsylvania Shield Law, as well as under the Federal and State Constitutions, Hatchard filed a motion to compel production on February 3, 1981. The trial court denied the motion on March 20, 1981, holding that the material sought was privileged, but it did so without prejudice to Hatchard's right to reformulate its request. Hatchard filed an amended request for production of documents on May 21, 1981, and KYW responded on June 17, 1981, again claiming privilege. This engendered Hatchard's second Motion to Compel, which is at issue here.

uments, as well as persons, and that all the material sought was therefore privileged. Defendant's Reply Memorandum of Law in Opposition to Plaintiff's Motion to Compel Production of Documents, filed August 12, 1981, at pp. 8–14. On February 11, 1982, the trial court entered the following order:

> Plaintiffs' Motion to Compel Production of Documents is granted and it is hereby Ordered that the Defendants are to produce the following documents within Thirty (30) days:
>
> 1. All tapes, film, transcripts, memoranda, etc., prepared by the I–Team, of statements by or interviews with Plaintiff, George Hatchard.
> 2. All tapes and/or film prepared by the I–Team, of statements by or interviews with the following:
> a. William Klenk
> b. Hillel Levinson
> c. Carl Biegler
> d. Richard Wills
> e. Bob Mindlin
> f. Francis Rizzo
> g. William Taylor
> h. Ben Wolf
>
> In responding to items 1 and 2, Defendant shall not be required to produce any material where another source is revealed or where the material contains information which could reasonably lead to the disclosure of another source by the primary source (the people listed above). Plaintiff's request for the production of transcripts, memoranda or other notes prepared by the Defendants in conjunction with their interview of the above individuals is denied.

Following the trial court's denial of KYW's motion that the court amend this order, KYW took this appeal.[4]

---

4. The court's order compelling production is interlocutory, and Hatchard, as a threshhold matter, challenges our jurisdiction to hear this appeal. The basis of the challenge is that when the trial court refused to certify its order to us as one involving a "controlling question of

On June 25, 1984, appellee Lefkoski sued appellant NEP Communications, Inc., t/d/b/a WNEP–TV Channel 16 News ("NEP"), alleging that NEP's news report broadcast on May 28 and May 29, 1984, had conveyed the impression that Lefkoski's auto repair business, "Ziggy's South Wilkes-Barre Auto Body Shop," had engaged in questionable business practices. On July 23, 1984, Lefkoski requested, pursuant to Pa.R.C.P. 4009, that NEP produce the following:

1. All writings, photographs, tapes, films, scripts, sound reproductions, records, editorial records, and other compilations of data of, concerning or relating in any way to the following:

 a. Any investigation or investigations made by the defendant concerning the plaintiff and/or plaintiff's business, known as Ziggy's South Wilkes-Barre Auto Body Shop, Rear 611 South Main Street, Wilkes-Barre, PA 1870 [*sic*].

 b. Any information which on or before May 29, 1984 became known to the defendant concerning the plaintiff and/or plaintiff's said business.

 c. The interview conducted on or about May 23, 1984 by agents and/or employees of the defendant with the plaintiff at the aforesaid place of business of the plaintiff.

 d. The complete television news broadcasts transmitted by the defendant on May 28, 1984 and May 29, 1984 and in which the said broadcasts included any reference whatever to the plaintiff and/or plaintiff's said business.

 e. The anchor-intro to the aforesaid television news broadcasts.

law as to which there is substantial ground for difference of opinion," *see* Pa.R.App.P. 1311, KYW filed a Petition for a Writ of Prohibition or Mandamus with this court on June 11, 1982, asking that we order the trial court not to enforce its order. (169 Misc. Docket 13.) The proper procedure by which to appeal a trial court's refusal to certify an interlocutory order is by means of a petition for review. *See* Pa.R.App.P. 1311, comment. We chose, however, to consider KYW's petition as a petition for review, and as such, granted the petition. The appeal is therefore properly before us.

f. The teases to the aforesaid television news broadcasts.

g. All matters edited from and/or omitted from the final form of the aforesaid interview and television news broadcasts.

R. at 3.[5]

NEP opposed most of this request. While it agreed to provide materials it classified as "as broadcast,"[6] it refused to provide all other materials, claiming, among other matters, that all such material was privileged under the Pennsylvania Shield Law. Defendant's Response to Plaintiff's Request for Production of Documents at 1-2, R. at 6. On September 20, 1984, Lefkoski filed a Motion to Compel the Production of the requested material. R. at 7. After hearing, held on November 8, 1984, R. at 12, the trial court issued the following order:

NOW, this 21 day of February, 1985, at 9:10 o'clock, A.M., it is hereby ORDERED, ADJUDGED and DECREED that, consistent with the annexed Decision, Defendant shall respond to the Request of Plaintiff for Production and Inspection of Documents in possession of Defendant under Pa.Rule of Civil Procedure 4009, within thirty (30) days from the date of this Order."

R. at 13.

On March 28, 1985, the trial court granted NEP's request that it amend its order to include certification of its ruling to us, as well as a stay pending appeal, pursuant to 42

5. Lefkoski filed a second request for production under Pa.R.C.P. 4009 on November 16, 1984. R. at 10. This request apparently referred to a later news broadcast. Because the order of the court that is the subject of the present appeal responded only to Lefkoski's first request for production, we do not consider the second request. *See* slip op. of tr. ct. at 1-2, R. at 13.

6. The "as broadcast" material was "(a) videotapes of the news broadcast at 12:00 Noon and 6:00 P.M. on May 28, 1984, and at 6:30 A.M. on May 29, 1984; (b) scripts of stories relating to the Plaintiff during those news broadcasts; and (c) scripts of broadcasted anchor-intros and teases relating to those news stories." R. at 6. NEP apparently did provide this material to Lefkoski, and it is not, therefore, at issue here. *See* Motion for Order Under Pa.R.C.P. 4019, Exhibit dated August 28, 1984, R. at 7.

Pa.C.S. § 702(b). R. at 15. On May 7, 1985, we granted NEP's petition for permission to take this interlocutory appeal. R. at 14.

All parties to these appeals agree that the dispositive issue is whether the Pennsylvania Shield Law absolutely protects from civil discovery all documentary material—notes, memoranda, films and tapes—prepared in connection with the news broadcasts that appellees claim are defamatory. *See* Brief for Appellant KYW at 7; Brief for Appellee Hatchard at 1; Brief for Appellant NEP at 4; Brief for Appellee Lefkoski at 1.

The Pennsylvania Shield Law, 42 Pa.C.S. § 5942(a), provides:

Confidential communications to news reporters.

No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose *the source of any information* procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit. (emphasis supplied)

The statute's coverage, and our decision here, is therefore controlled by the definition of the term "source of any information." Judge GREENBERG, in *Hatchard,* reasoned that since the policy of the Shield Law was to protect the identity of confidential informants, the term "source of any information" must refer to such informants. He concluded, accordingly, that the statute did not protect documentary material, unless that material had the potential of revealing the identity of confidential "sources." He therefore ordered that KYW produce the requested outtakes, but not other notes and documents, because "[appellees] in the instant case are not seeking to learn the identity of any confidential source through the outtakes." Slip op. of tr. ct. at 7. Judge BROMINSKI similarly based his decision to grant Lefkoski's Motion to Compel upon his conclusion that

"[t]he Shield Law plainly and unequivocally protects only 'the source of any information' procured by the [appellant].... [I]t does not protect *the information requested itself....*" Slip op. of tr. ct. at 10–11 (emphasis in original).

In *In Re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), our Supreme Court ruled on the issue before us, that is, the construction we must place upon the term "source of any information" in our Shield Law.[7] As this court has not addressed the issue, *Taylor* is the only appellate case from this jurisdiction that is directly in point.

In *Taylor*, a grand jury investigating political corruption within the Philadelphia city government served a subpoena duces tecum upon Robert Taylor, president of the *Philadelphia Bulletin*, and Earl Selby, the newspaper's city editor. The grand jury's investigation centered on John J. Fitzpatrick, a former Democratic ward leader and a former Sergeant at Arms of City Council, who had been interviewed by an Assistant District Attorney on February 20, 1962, in preparation for the grand jury. On December 30, 1962, the *Bulletin* published an article entitled "Fitzpatrick's Secret Talk to DA is Bared." The article consisted primarily of what purported to be questions put to Fitzpatrick by the Assistant District Attorney, and Fitzpatrick's responses. The grand jury subpoena directed Taylor and Selby to appear before it, and to bring with them all documents, of whatever kind, relating to the interview with Fitzpatrick, as well as any documents relating to the paper's subsequent investigation as a result of leads furnished by Fitzpatrick. *Id.*, 412 Pa. at 36, 193 A.2d at 182. Taylor and Selby appeared before the grand jury, but refused to answer several questions and refused to produce any documentary material, claiming that the Pennsylvania Shield Law protected them from being compelled to do so. The trial court held that the Shield Law protected a reporter only from being compelled to identify confidential sources—

7. The statute construed in *Taylor* was the Act of June 25, 1937, P.L. 2123, No. 433, § 1, which was identical, in relevant language, to our present Shield Law. *See In Re Taylor, supra* at 38, 193 A.2d at 183; *compare* 42 Pa.C.S. § 5942(a).

persons—but that it did *not* protect the information that the sources disclosed to the reporter. It thus ordered that Taylor and Selby produce documentary material, carefully limiting its order to material that did not have the potential of disclosing the identity of a confidential source. In order to accomplish this, the order allowed the newspaper to delete such material as it thought necessary.[8]

On appeal, the Supreme Court reversed, in a 6–1 decision. It held, per Chief Justice BELL, that although neither the Federal nor State Constitution protected Taylor and Selby against compelled disclosure, the Pennsylvania Shield Law did. The Court stated that the statutory issue "boil[ed] down in the last analysis to the meaning of *'the source of any information'* procured or obtained by such person." *Id.*, 412 Pa. at 40, 193 A.2d at 184 (emphasis in original). Citing various dictionaries, the Court continued:

> We believe the language of the Statute is clear. The common and approved meaning or usage of the words "source of information" includes documents as well as personal informants. [Citations omitted] "Source" means not only the identity of the person, *but likewise includes documents*, inanimate objects *and all sources of information*. Furthermore, if there were any doubt

**8.** The trial court's order, as summarized in *Taylor,* provided:
> ... (1) that appellants were *not* required to produce an alleged copy of statements made by John Fitzpatrick to the District Attorney's office on February 20, 1962 and set forth in part in The Bulletin on December 30, 1962, since, inter alia, the result might be to disclose the identity of the transmitter of the alleged copy to The Bulletin; (2) that appellants were *not* required to produce memoranda, notes, reports and other documents of or pertaining to investigations conducted by The Bulletin as a result of information furnished by John Fitzpatrick, since such investigations, made on leads furnished by Fitzpatrick, would doubtless encompass confidential interviews with other persons who would give information only if their identity were kept secret; (3) that appellants were *not* required to produce the results of alleged polygraph (lie-detector) tests given to Fitzpatrick, since, inter alia, this would reveal the identity of the experts who conducted such tests; but (4) that appellants *were* required to produce documents and tape recordings allegedly evidencing that John J. Fitzpatrick had told Bulletin reporter, ... *Id.*, 412 Pa. at 37–38, 193 A.2d at 183 (emphasis in original).

as to the interpretation, the Statute must be liberally construed in favor of the newspapers and news media. *Id.*, 412 Pa. at 40, 193 A.2d at 184–85 (emphasis in original).

Having broadly defined the statute's coverage, the Court proceeded to analyze the conditions under which a reporter might waive the statute's protection. It noted that the trial court had ordered that certain documentary material be produced (albeit with names deleted) because it concluded that the newspaper, having published the name of its informant, had thereby waived its privilege regarding any information it received from that informant, whether or not the information itself had been published. The Court, in no uncertain terms, rejected this reasoning, as well as the trial court's solution of allowing the newspaper to redact names from the material it ordered disclosed. The Court's analysis demonstrated that it attached no significance to the fact that the newspaper had not kept the identity of its informant confidential.

> If the Act of 1937 applies only to *persons* and does not include documents, then logically appellants would have to disclose and produce *all documents* in their possession. However, Judge KELLEY [the trial judge] in an attempt to fairly (although erroneously) limit the source of information to persons as distinguished from documents, ruled that appellants were required to produce only the documents and tape recordings allegedly evidencing what Fitzpatrick had told reporters *with all names deleted.* No one could know with certainty whether the documents as deleted by the newsman would still reveal sources of information which the Act intended to protect, Judge KELLEY based his ruling principally if not solely on his conclusion that the Bulletin had waived the privilege created by the Act of 1937 by publishing in its aforesaid article on December 30, 1962, the single sentence hereinabove quoted: "However, much of the subsequent questioning dealt with what John Fitzpatrick had told Bulletin reporters." This obviously gave Fitzpatrick

as the leading source, but the identity of many other persons may have been revealed in the questions and/or the answers.

If a Court can select or direct newsmen in its or their judgment to select or delete what information is disclosed by the informer or to furnish the documents in full with only the names deleted which the newsman or the Court sincerely believes should be deleted, the purpose, the object and the intent of the Act will be *realistically* nullified. We therefore hold that a waiver by a newsman applies only to the statements made by the informer which are actually published or publicly disclosed* and not to other statements made by the informer to the newspaper.

*Id.*, 412 Pa. at 43, 193 A.2d at 186 (emphasis in original).[9]

*Taylor's* broad interpretation of the term "source" drew a strong dissent from Justice COHEN. He argued that the purpose of the Shield Law was "to encourage the flow of news from persons who might otherwise fear the unfavorable publicity or retribution resulting from the revelation of their names as the source of the news story.... In other words, *it is the name of the informant and not the information itself that is protected.* Once the name of the informant is revealed, the purpose and protection of the Act is terminated." *Id.*, 412 Pa. at 45, 193 A.2d at 187 (emphasis in original). Justice COHEN believed that the majority had erred because it

9. Appellee Hatchard argues that KYW has waived its protection under the Shield Law because the policy of the law is "to protect the source of the information and this policy is not implicated where, as in the present case, the confidentiality of the source is not at issue." Hatchard also urges that, to the extent *Taylor* indicates otherwise, it may be distinguished. Brief for Appellee Hatchard at 20–25. This analysis is very similar to Judge KELLEY's analysis, which was rejected by the Supreme Court in the language cited above. We are further precluded from making the distinctions urged here by the Supreme Court's mandate that we apply *Taylor* broadly. *See infra. See also Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 279 (3d Cir.1980) (As *"Taylor* protects all nonpublished portions of a source's statement, we hold that the outtakes ... are protected even though the identity of the primary source of information is known.")

confuse[d] "source of information" and "information".... The *source* of the information was disclosed to the Grand Jury as John Fitzpatrick; what is now sought is the *information* given by Fitzpatrick. In reversing the contempt convictions, the majority rewrites the statute and permits appellants to conceal the information itself. One searches the majority opinion in vain for any basis to support this perversion of [the Shield Law.] *Id.*

*Taylor* was similarly criticized in contemporary literature. *See* Note, "EVIDENCE—Newspapermen Not Required to Divulge Confidential Information to Investigating Grand Jury Even After Informant's Identity Has Been Voluntarily Disclosed in Newspaper Article," 112 U.Pa.L.Rev. 438 (1964); Note, "Evidence-Privileged Communications—Journalist Need Not Reveal Information Disclosed by Confidential Informant—*In the Matter of Taylor* (Pa.1963)," 77 Harv.L.Rev. 556 (1964). Other jurisdictions have not found *Taylor* persuasive and have declined to follow it in construing similar language in their shield laws. *See Williams v. American Broadcasting Companies,* 96 F.R.D. 658, 664–65 (W.D.Ark.1983); *State v. Sheridan,* 248 Md. 320, 322, 236 A.2d 18, 19 (1967).

Such criticism, which has considerable force,[10] might persuade us to distinguish *Taylor* from the cases before us, for it is true that the factual context in which *Taylor* arose was that of a subpoena duces tecum issued by a grand jury, while here we confront civil discovery motions. We do not believe, however, that *Taylor* may be convincingly distinguished in this way, for the issue to which we must look to *Taylor* for guidance—the meaning of the term "source"—is identical to the issue raised in the cases at bar. Even were this not the case, *Taylor* precludes us from making any such factual distinctions for in *Taylor* the Court instructed us not once, but twice, that "if there were any doubt as to the interpretation, the Statute must be liberally construed in favor of the newspapers and newsmedia." *In re Taylor, supra,* 412 Pa. at 40, 193 A.2d at 185. *See also id.,* 412 Pa.

10. *See infra.*

at 42, 193 A.2d at 185–86. Moreover, *Taylor* presented a more attractive setting for narrowing the scope of a reporter's privilege than does that of a civil discovery motion. Courts, in considering claims of a reporter's privilege, have generally considered the interests of investigating grand juries and of criminal defendants to be far more compelling than those of civil litigants. *See, e.g., Branzburg v. Hayes,* 408 U.S. 665, 690, 92 S.Ct. 2646, 2661, 33 L.Ed.2d 626 (1972) ("[W]e perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to questions put to them in the course of a valid grand jury investigation or criminal trial."); *Mitchell v. Superior Court,* 37 Cal.3d 268, 278–79, 208 Cal.Rptr. 152, 158, 690 P.2d 625, 631 (1984) (Distinguishing scope of reporter's privilege in civil and criminal contexts, California Supreme Court finds that "[i]n criminal proceedings, both the interest of the state in law enforcement ... and the interest of the defendant in discovering exonerating evidence outweigh any interest asserted in ordinary civil litigation." (citation omitted)). *See generally* P. Marcus, "The Reporter's Privilege: An Analysis of the Common Law, *Branzburg v. Hayes* and Recent Statutory Developments," 25 Arizona L.Rev. 815, 851 n. 259 (1983). The fact that our Supreme Court gave such a broad interpretation to the statutory privilege in *Taylor* indicates that it would find the case for such an interpretation to be even more compelling in the case of a civil litigant.

Although we may not distinguish *Taylor* on its facts, we do note that it was decided in 1963. As we will discuss,[11] there has been considerable development in the law of libel since that date. It does not follow from this development, however, that we may conclude that *Taylor* does not bind us because it is "old law." In 1968, more than five years after *Taylor* was decided, the Pennsylvania legislature

**11.** *See infra.*

amended the Shield Law. In doing so, it did not change the language "source of any information," but rather broadened the statute's coverage to include reporters employed by electronic media and the wire services. *See and compare* 28 Pa.C.S. § 330, Act of June 25, 1937, P.L. 2123, No. 433, § 1, as amended Dec. 1, 1959, P.L. 1669, § 1 *with id.*, as amended July 31, 1968, P.L. 858, § 1, 28 Pa.C.S. § 330, *and with* 42 Pa.C.S. § 5942(a). When the Supreme Court has construed statutory language, and that language is not changed in subsequent versions of the statute, we must presume that the legislature "intends the same construction to be placed upon such language." *See* 1 Pa.C.S. § 1922(4).

*Taylor's* continuing vitality is also evident from a brief survey of relevant federal case law. All recent cases concerning the Pennsylvania Shield Law have been litigated in federal courts. These courts have been required to apply Pennsylvania law to cases that are virtually indistinguishable from those presently before us. They have uniformly considered *Taylor's* definition of the term "source" to be dispositive. Thus in *Lal v. CBS, Inc.*, 726 F.2d 97 (3d Cir.1984), the plaintiff, a landlord, claimed that a television program broadcast by one of the defendant's local affiliates had defamed him. He sought to compel production of outtakes of interviews with him and other named interviewees, as well as other notes and memoranda. The district court reluctantly denied the plaintiff's motion because it considered itself bound, in a diversity action, by the Pennsylvania Supreme Court's interpretation of Pennsylvania law. *Lal v. CBS, Inc.*, 551 F.Supp. 356, 366 (E.D.Pa.1982). The Third Circuit affirmed, also relying upon the authority of *Taylor*, as well as that of *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir.1980). *Lal v. CBS, Inc., supra* at 100.

In *Steaks Unlimited, Inc. v. Deaner, supra,* the plaintiff claimed that the defendant, an investigative reporter, had prepared a defamatory news broadcast concerning the quality of the meat it sold. It sought to compel the production of outtakes of interviews conducted by the film crew with

Aubrey Mills, one of the plaintiff's employees, as well as those with two of the plaintiff's customers, whose identities had not been disclosed. The Third Circuit held that the outtakes of the interviews with the unidentified customers undoubtedly came within the statute's protection "[i]nasmuch as discovery of the latter would reveal the identity of the primary sources of information...." *Id.* at 278. As to the outtakes of the interview with a disclosed informant, the court considered *Taylor* dispositive:

> The outtakes of the Mills interview pose a slightly different problem. The primary source, Mills, is known. Thus, discovery of the outtakes would not necessarily reveal the identity of a source of information. Nevertheless, the outtakes are privileged under the *Taylor* construction of the shield statute. In *Taylor*, the court interpreted the statute as protecting not only the primary source of the information, but also possible secondary sources that might be disclosed by the primary source. The court did not require the journalists to demonstrate the existence of such secondary sources. Rather, it held that the statute protected all statements by the primary source except those that were published or publicly disclosed, because "the identity of many other persons may have been revealed in the questions and/or the answers." Similarly, even though the primary source of the Mills interview is known, discovery of the outtakes may reveal the identity of secondary sources. Inasmuch as *Taylor* protects, all nonpublished portions of a source's statement, we hold that the outtakes of the Mills interview are protected even though the identity of the primary source of information is known. Accordingly, the district court did not err in denying Steaks' motion to obtain the outtakes.

*Id.* at 279 (footnotes omitted).

*See also Coughlin v. Westinghouse Broadcasting and Cable, Inc.*, 603 F.Supp. 377, 381 (E.D.Pa.1985) *aff'd per curiam*, 780 F.2d 340 (3d Cir.1985) (In action brought by police officer against television station on basis of allegedly

defamatory broadcast, court denied plaintiff's request for outtakes of interviews with disclosed informants, relying on *Taylor* and *Steaks* to hold that the Shield Law protected against the mere possibility that a source would be revealed and that "[a] reporter need not show that unidentified secondary sources actually exist."). *See also Mazzella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. 523 (E.D.N.Y. 1979) (In context of libel suit, applying Pennsylvania law and *Taylor*, court holds documents that might reveal sources are protected, despite plaintiff's argument that without access to material he would be unable to meet his concededly difficult burden of proof); *Altemose Construction Co. v. Building & Construction Trades Council*, 443 F.Supp. 489 (E.D.Pa.1977) (Where defendant in federal civil action served program manager of television station with subpoena duces tecum, court quashes subpoena, holding, per *Taylor*, that all sources, including both persons and documents, are privileged, without reference to their confidentiality); S. Metcalf, § 3.39 *Rights and Liabilities of Publishers, Broadcasters and Reporters* (1984).

The interpretation and application of our case law by the federal courts has recently been cited with approval by our own Supreme Court in *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *appeal pending*, — U.S. —, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985). In support of its conclusion that the defendant in a civil libel action bears the burden of disproving a presumption that an alleged defamatory statement is false, the Court pointed to the extensive protection that the Shield Law conferred upon media defendants:

> We note further that a media defendant in a civil libel action is given even greater protection under our statutory law. In addition to the privilege to communicate matters of public interest and concern without fear of liability for erroneous information disseminated without negligence or malice, a newspaper publisher is privileged to withhold the identity of sources of information. [Citing Pennsylvania Shield Law] ...

This statute has been interpreted broadly. *See, e.g., Lal v. CBS, Inc.*, 726 F.2d 97, 100 (3d Cir.1984); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 278 (3d Cir. 1980); *In Re Taylor*, 412 Pa. 32, 40, 193 A.2d 181, 185 (1963). There, sources are excludable whether or not they contain the identity of sources actually used by the newspaper since the identity of all persons named or implicated in these sources is also included within the protection of the "shield law". *Lal v. CBS, Inc., supra* at 100; *Steaks v. Deaner, supra* at 278; *In Re Taylor, supra*, 412 Pa. at 40, 193 A.2d at 185.

*Id.*, 506 Pa. at 327, 485 A.2d at 386–87 (footnote omitted).

While this statement might be considered *dictum*, we must, in the absence of any more recent statement by our highest court, regard it as an affirmance of the continuing vitality of *Taylor* as interpreted and applied by the federal courts.

■ Given the strength of the foregoing authority, we must consider the courses that are open to an intermediate level appellate court when it is faced, as we are here, with a rule of law that is clear but that when applied to the facts of the case before it, may lead to an unjust result.[12] We do

---

**12.** This dilemma might be avoided if we were able to conclude that a plaintiff in a defamation action has a competing constitutional interest that, in effect, "trumped" the statutory privilege conferred by the Shield Law. The trial court in *Hatchard* found such a right. The court relied on three provisions of the Pennsylvania Constitution: Article 1 § 1, which provides:

**Inherent Rights of Mankind**
Section 1. All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Article 1 § 11, which provides:

**Courts to Be Open; Suits Against the Commonwealth**
Section 11. All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

And Article 1 § 7, which provides:

**Freedom of Press and Speech; Libels**
Section 7. The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any

Note 12—Continued

branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

These provisions, the court concluded, create a constitutional right to protect one's reputation by bringing a private action for defamation. On the basis of this analysis, the court "agree[d] with [Hatchard's] argument that they must have access to the requested documents in order to exercise their Constitutional right." Slip op. of tr. ct. at 4. We cannot agree that any of the constitutional provisions cited by the trial court create any right to bring a defamation action that cannot be limited by a privilege created by the legislature.

Article 1 § 1 certainly classifies the right to "acquire[ ], possess[ ] and protect[ ] ... reputation" as a fundamental right on a par with "acquiring, possessing and protecting property," "enjoying and defending life and liberty," and "pursuing [one's] own happiness." Several of our cases have recognized this. *See Wolfe v. Beal,* 477 Pa. 477, 384 A.2d 1187 (1978) (Person unlawfully committed to state mental hospital has right to destruction of hospital records because Pennsylvania Constitution grants all men the right to protect reputation); *Moyer v. Phillips,* 462 Pa. 395, 400, 341 A.2d 441, 443 (1975) (Court holds that exception in survival statute for causes of action for libel and slander is arbitrary, and therefore violates equal protection, citing fundamental interest in reputation). At issue here, however, is *not* whether such a fundamental right to reputation exists, but rather whether the right to vindicate one's reputation by a particular means—an action in trespass—is of such elevated constitutional status as to be immune from legislative limitation. Our assumption has always been that the legislature *may* limit such actions, just as it may limit actions in assumpsit brought to protect one's fundamental right to protect one's property. *See, e.g., Steaks Unlimited, Inc. v. Deaner, supra* at 279 n. 74 ("[T]o the extent a state chooses to authorize a cause of action for defamation, it may also limit the plaintiff's ability to prove his claim in order to promote other social purposes."); *Mazzella v. Philadelphia Newspapers, supra* at 528 ("The State has created the [defamation] cause of action and hence ... it can limit, modify or perhaps take it away through the operation of testimonial privileges, absent any claim of constitutional deprivation.") Our courts have, indeed, always proceeded on such assumptions, for we have judicially created a class of privileged statements that, however damaging they may be to a citizen's "fundamental right of reputation," may not, nevertheless, serve as a basis for a defamation action. *See, e.g., Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53 (1971) (Statements by

Note 12—Continued

witness, counsel or judge in judicial proceedings are absolutely privi-
leged and cannot serve as basis for defamation action); *Jennings v.
Cronin,* 256 Pa.Super. 398, 389 A.2d 1183 (1978) (Testimony at legisla-
tive proceedings is absolutely privileged and may not serve as basis
for defamation action). Indeed, most courts that have considered the
specific question at issue here assume that a plaintiff in a civil
defamation action, unlike a criminal defendant, has *no* constitutional
interest to offset the media defendant's assertion of privilege. *See
Mazzella v. Philadelphia Newspapers, supra* at 528–29 (Applying Penn-
sylvania law, court holds that the Pennsylvania Shield Law "impinges
on no constitutionally protected right" for it finds no "constitutional
right to a cause of action sounding in defamation[.]"); *Maressa v. New
Jersey Monthly,* 89 N.J. 176, 193, 445 A.2d 376, 385, *cert. denied,* 459
U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982) (As defamation plain-
tiff's "interest in compelling disclosure ... does not reach constitu-
tional dimensions", court holds there is "no overriding constitutional
interest at stake ..." in defamation action.). *See generally* P. Marcus,
"Reporter's Privilege," *supra* at 851 n. 259 (Because no constitutional
right is at issue in a civil defamation action, courts "are less reluctant
to define the privilege broadly in such a case.").

Similarly, Article 1 § 11, also cited by the trial court, simply protects a
plaintiff's right of access to the courts; it does not create a right of
access to all materials a litigant may seek through the discovery
process. *See Samuelson v. Susen,* 576 F.2d 546, 552–553 (3d Cir.1978)
(Privilege depriving defamation plaintiff of material he seeks to dis-
cover does not deny him access to the courts); *Coughlin v. Westing-
house Broadcasting and Cable, Inc., supra* (same; plaintiff's argument
to contrary termed "attenuated").

Finally, Article 1 § 7, also cited by the trial court, does not contem-
plate the private vindication of one's reputation in a private def-
amation action. Rather, its purpose is to enlarge the liberty of the
press by curbing the power of the state to indict a printer for the
crime of "seditious libel." It meant no more than: prior restraints on
the freedom to publish were prohibited; if the state wished, it might
hold a printer responsible for "abuse of that liberty" by indicting him
for seditious libel; at the criminal trial that followed, however, prior
colonial practice was changed to make it easier for the jury to acquit
by providing that "in all indictments for libels the jury shall have the
right to determine the law and the facts." *See* L. Levy, *The Emergence
of a Free Press,* 212–13 (New York, 1985).

The New Jersey Supreme Court faced a similar contention in *Maressa
v. New Jersey Monthly, supra.* The issue in *Maressa* was whether the
New Jersey Press Shield Law, N.J.S.A. 2A:84A–21, "absent any con-
flicting constitutional right" such as that present in a criminal case,
protected a defamation defendant from compelled disclosure of
sources and editorial processes. *Id.* at 192, 445 A.2d at 383. Justice
SCHREIBER, alone in dissent, found such a countervailing right in
Article 1 § 6 of the New Jersey Constitution, which provides:

> **Liberty of speech and of the press; libel; province of jury.** Every
> person may freely speak, write and publish his sentiments on all
> subjects being responsible for the abuse of that right. No law shall
> be passed to restrain or abridge the liberty of speech or of the press.
> In all prosecutions or indictments for libel, the truth may be given

not, of course, know what the outtakes involved in the two appeals before us would reveal, if indeed they would reveal anything. It is not difficult, however, to imagine a case in which access to the outtakes would be dispositive. Suppose this case, for example: The plaintiff is a Governor. To recover, he will have to prove the defendant radio station's "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The broadcast portion of the tape may be reasonably understood as an admission by the Governor that he solicited a bribe. The outtakes, however, make it plain that in fact the Governor was vehemently denying ever having solicited a bribe. In our view, to argue that such dishonesty should be protected does not honor but rather demeans free speech as one of our most precious liberties. And yet, under *Taylor* the Governor could not have access to the outtakes.

■ Our reservations regarding the justice of the *Taylor* rule do not, however, free us of the constraints imposed upon us as an intermediate appellate court. Intermediate appellate courts are created to ease the burden on the courts of last resort. *See* Spaeth, "Achieving a Just Legal System: The Role of State Intermediate Level Appellate

---

in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact. On the basis of this clause, very similar in language and purpose to that of Pennsylvania, Justice SCHREIBER found that a defamation plaintiff's right to sue was constitutionally protected, and that the provisions of the New Jersey Shield Law must yield to that right. *Id.* at 390–94 (SCHREIBER, J., dissenting.) The majority rejected this view. It reasoned:

It would not be wise to construe our Constitution in a way that etches in stone any particular resolution of the difficult conflict between the right of the media to criticize public figures and the right of public figures to have redress for libel. Our holding ... balances those interests differently than the dissent would balance them. But the balance we adopt can always be changed by the Legislature. If we were to adopt the dissent's view, full protection for sources or editorial processes could only be provided by constitutional amendment.

*Id.* at 192–93, 445 A.2d at 385.
We believe the same may be said here.

Courts," 462 Annals, American Academy of Political and Social Science 48, 52 (1982). Their primary role, therefore, is to apply existing law to the great volume of cases that come before them. That is not, however, their only role. As Justice HOPKINS, of the Second Appellate Division of the New York Supreme Court, has observed: "[S]ince the full flow of appeals is centered in the intermediate courts, it is those courts which are in a better position to determine in what areas of the law confusion is occurring and where reform or clarification is necessary. This suggests a second role for the intermediate court—to stimulate revision in the law either by the highest court through common law doctrine or by the legislature through the enactment of statutes." Hopkins, "The Role of An Intermediate Appellate Court," 41 Brooklyn L.Rev. 459, 464 (1975). In this role an intermediate appellate court may serve as "a laboratory for the highest court," *id.* at 473, for its greater volume of cases brings the need for change to its attention rapidly, and by its decisions it may sharpen the issues and thereby perhaps suggest possible solutions to the highest court, or to the legislature, as the case may be. Spaeth, "Intermediate Appellate Courts," *supra* at 52.

Sometimes, as Justice HOPKINS observes, an intermediate appellate court may engage in "quiet usurpation of . . . existing case law." This occurs when the intermediate appellate court "consciously or unconsciously undermines doctrine by the process of distinction without expressly impugning the doctrine." Alternatively, the court may "bold[ly] challenge" the doctrine by expressly overruling it, and "[u]sually, it justifies its decision by claiming that the doctrine no longer fits contemporary circumstances; and it implies that it is taking the action which the highest court would itself have taken if given the opportunity." Hopkins, *supra* at 466–67. Justice HOPKINS counsels, however, against the use of such methods:

Neither of these expedients seems to me to be appropriate. The highest court may indeed resent the destruction of the doctrine either by the slow erosion of distinction or

by the straightforward method of overruling. What may be a worthy and desirable purpose is lost by the quick and contrary response of the highest court to the trespass of the intermediate court upon the province of the highest court to mold the law.

He therefore concludes:

More properly, it seems to me the intermediate court's function should be carried out by suggestion, by indicating the reasons for change, but not by infringing upon the prerogative of the highest court to make changes in the law. If stare decisis is to continue to hold any place in the judicial system as a control on the uniform and non-discriminatory determination of similar disputes, there cannot be two sources for the definition of the law to be applied. Any process other than the establishment of final power in one court—at the highest tier—results only in a distrust of the system and in utter confusion among the bar and the trial courts. If the merit of the change is exposed by the statement of the intermediate court, we should expect that the highest court will give suitable consideration to the recommendation.

*Id.* at 467–68.

We agree with this statement, and adopt it as our own. Applying it to the cases before us, we have concluded that while we are bound by *Taylor* and must accordingly reverse the orders of the trial courts, we nevertheless may, and should, express our reservations regarding *Taylor.* Our decision in this regard is not unprecedented. We have on other occasions found that the proper discharge of our responsibilities as an intermediate appellate court has required criticism of the current state of the law. *See, e.g., Commonwealth v. Mlinarich,* 345 Pa.Super. 269, 498 A.2d 395 (1985), (considering meaning of "forcible compulsion" as element of rape in light of appellate decisions and legislative history of Crimes Code, and suggesting need for review by Supreme Court and legislature); *Interest of Miller,* 301 Pa.Super. 511, 526, 448 A.2d 25, 32 (1982) (application of doctrine of common law marriage; observa-

tion that if application seems inappropriate, legislative changes needed); *Commonwealth v. Reeves*, 223 Pa.Super. 51, 55, 297 A.2d 142, 144 (1972) (PACKEL, J., concurring) (application to intoxicated driving case of principle that to arrest without warrant, arresting officer must see driving; legislative change suggested).

First, then, we believe that the language in our Shield Law, "source of any information," when read in its most straightforward way, refers to people and not to information. If so construed, our Shield Law would protect only the identity of confidential sources—persons; it would not shield the information that a source had conveyed. In support of this construction, we note that had the legislature intended to protect *both* the source of information and the information itself, it could easily have chosen language that does so expressly. *Compare* 42 Pa.C.S. § 5929 ("No physician shall be allowed, in any civil matter, to disclose *any information* which he acquired in attending the patient in a professional capacity....") (emphasis added). We also find support for this construction in the language of press shield laws in other states.[13] Several states have chosen to protect both sources and information, while others have chosen to protect sources only; both intentions are clear from the statutory language. *See, e.g.,* MONT.CODE ANN. § 26-1-902(1) (No reporter "may be required to disclose any information ... or the source of that information...."); NEB.REV.STAT. § 20-146 (No reporter "shall be required to disclose ...(1) the source of any published or unpublished, broadcast or non-broadcast information ... or (2) Any unpublished or nonbroadcast information ...."); OKLA.STAT. tit. 12 § 2506 (1980) (No reporter "shall be required to disclose .... 1. The source of any published or unpublished. information ... or; 2. Any unpublished information ....). *Compare* ARK.STAT.ANN. § 43-917 (1977) (Before a reporter "shall be required to disclose ... the source of information used as the basis for any article

13. These statutes are cited in P. Marcus, "Reporter's Privilege," *supra* at 859-60, n. 323.

he may have written, published or broadcast," plaintiff must show that publication was made "in bad faith, with malice, and not in the interest of the public welfare."); MD.CTS. & JUD.PROC.CODE ANN. § 9–112 (1980) (A reporter "may not be compelled to disclose, in any legal proceeding or trial ... or elsewhere, the source of any news or information...."); OHIO REV.CODE ANN. § 2739.12 (Page 1981) (No reporter "shall be required to disclose the source of any information procured or obtained by any such person in the course of his employment...."). Courts in states in which the statute, like Pennsylvania's, protects only the "source of any information", have construed the statute to protect the identity of sources, not to shield the information that a source provides. *See, e.g., Williams v. American Broadcasting Companies*, 96 F.R.D. 658 (W.D. Ark.1983) (Since Arkansas Shield Law protects only sources, television news outtakes are not within scope of its protection); *Tofani v. State*, 297 Md. 165, 465 A.2d 413 (1983) (Maryland Shield Law protects identity of sources, but not the information received from them); *State v. Geis*, 2 Ohio App.3d 258, 441 N.E.2d 803 (1981) (Ohio statute protects only the identity of the informant, not the information communicated by him).

These considerations would not be persuasive, were we to conclude that *Taylor's* definition of the term "source of any information" serves important policy objectives. We believe, however, that that is not the case.

Since *Taylor* was decided in 1963, the law of libel has been transformed. Beginning with the landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court has imposed federal constitutional requirements on what previously had been state law. As a result of this "constitutionalization" of libel law, plaintiffs now bear a much heavier burden of proof. *See New York Times Co. v. Sullivan, supra* at 279–80, 84 S.Ct. at 725–26 (Plaintiff may recover damages from media defendant only if he proves challenged statement or publication was made with "actual malice," that is,

with knowledge that it was false or with reckless disregard of whether it was false or not); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (To prove "actual malice," plaintiff must present "sufficient evidence to permit conclusion that the defendant in fact entertained serious doubts as to the truth of the publication"); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (Jury may not impose liability without fault upon media defendants, even where plaintiff is private figure). It is now, therefore, extremely difficult for libel or defamation plaintiffs, especially if they are "public figures," to recover unless they have access to materials that will enable them to prove a defendant's state of mind at the time of publication. In *Gertz v. Robert Welch, Inc., supra* at 342, 94 S.Ct. at 3008, the Supreme Court recognized that as a result of *New York Times* and its progeny, "some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." In *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Court explicitly recognized the need to accommodate the conflicting rights of the libel or defamation plaintiff and the media defendant. The plaintiff, a former army colonel, brought suit against C.B.S. and two of its employees, claiming that a news report the network had broadcast had defamed him. The plaintiff conceded that he was a "public figure," and that he therefore needed to prove that the defendants had acted with "actual malice" in order to recover. To this end he sought to compel the defendants to answer certain questions relevant to state of mind at the time the news report was prepared. The defendant refused to answer, claiming that "the First Amendment protected against inquiry into the state of mind of those who edit, produce, or publish, and into the editorial process. *Id.* at 157, 99 S.Ct. at 1639. The majority, per Justice WHITE, explained the policy considerations that led the Court to reject the defendant's argument:

> In the first place, it is plain enough that the suggested privilege for the editorial process would constitute a

substantial interference with the ability of a defamation plaintiff to establish the ingredients of malice as required by *New York Times.* As respondents would have it, the defendant's reckless disregard of the truth, a critical element, could not be shown by direct evidence through inquiry into the thoughts, opinions, and conclusions of the publisher, but could be proved only by objective evidence from which the ultimate fact could be inferred. It may be that plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself, but the relevance of answers to such inquiries, which the District Court recognized and the Court of Appeals did not deny, can hardly be doubted. To erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with "convincing clarity." *New York Times Co. v. Sullivan,* 376 U.S. at 285–286, 84 S.Ct. at 728–29.

*Id.* at 170, 99 S.Ct. at 1645–46 (footnote omitted).

Justice POWELL, in concurrence, suggested how courts might best accommodate the competing interests of defamation plaintiff and media defendant:

Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated. On the one hand, as this Court has repeatedly recognized, the solicitude for First Amendment rights evidenced in our opinions reflects concern for the important public interest in a free flow of news and commentary. See *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 781–783 [98 S.Ct. 1407, 1418–19, 55 L.Ed.2d 707] (1978); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 862–863 [94 S.Ct. 2811, 2821, 41 L.Ed.2d 514] (1974)

(POWELL, J., dissenting). On the other hand, there also is a significant public interest in according to civil litigants discovery of such matters as may be genuinely relevant to their lawsuit. Although the process of weighing these interests is hardly an exact science, it is a function customarily carried out by judges in this and other areas of the law.

*Id.* at 179–80, 99 S.Ct. at 1650–51 (POWELL, J., concurring).

*See also Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (reporters have no First Amendment privilege to refuse to respond to grand jury subpoena).

We recognize that *Herbert v. Lando, supra,* held only that a reporter's editorial processes were not privileged as a matter of federal constitutional law. Nothing in the decision precludes states from conferring greater protection, should they chose to do so. *See, e.g., Maressa v. New Jersey Monthly, supra* (New Jersey Shield Law construed to provide absolute protection to journalists not to disclose confidential sources *or* editorial processes). Nevertheless, the concerns expressed by the United States Supreme Court have led the majority of courts, both state and federal, to attempt to reach the accommodation counseled by Justice POWELL. Some have done so, as we have noted above, by construing their shield laws to cover sources, but not information. Others have defined the reporter's privilege as extending to civil, but not to criminal, proceedings. *See Senear v. Daily Journal-American,* 97 Wash.2d 148, 641 P.2d 1180 (1982). *See generally* O'Neil, "Shield Laws: Partial Solution to a Pervasive Problem," 20 New York Law Forum 515 (1975). The overwhelming majority of state and federal courts have chosen to follow Justice POWELL's suggestion in *Herbert v. Lando, supra,* and have adopted a balancing approach. *See Mitchell v. Superior Court, supra* at 277, 208 Cal.Rptr. at 157, 690 P.2d at 629 ("When called upon to weigh the fundamental values arguing both for and against compelled disclosure, the overwhelming majority of courts have concluded that the question of a

reporter's privilege in civil cases must be decided on a case-by-case basis with the trial court examining and balancing asserted interests in light of the facts of the case before it.") (collecting cases); P. Marcus, "Reporter's Privilege," *supra* at 856 ("The principle ... may be stated as follows: In civil cases generally, and in defamation cases in particular, the resolution of the reporter's privilege claim is to be made on a case-by-case basis .... Virtually every court to confront the issue of the reporter's privilege in civil actions has agreed that a balancing approach to the problem must be taken, with a heavy emphasis on the particular facts to be found in each case."). *See generally* Yarborough, "Press Privilege Claims and Balancing Doctrine," 31 Alabama L.Rev. 523 (1980).[14]

Our Supreme Court has also expressed its concern with these policy considerations. In *Hepps v. Philadelphia Newspapers, Inc., supra,* 506 Pa. at 328, n. 14, 485 A.2d at 387 n. 14, the Court cautioned that our Shield Law "was never intended to be interpreted as insulating the publisher from its negligence or actual malice." Yet *Taylor,* with its broad definition of the term "source of any information," seems to do just that, for it effectively precludes a trial court from ordering documentary material to be disclosed on the basis of its particularized inquiry into the facts of the case before it. As Judge LUONGO said, in concluding that

---

**14.** In seeking to avoid the *ad hoc* problems inherent in most balancing solutions, several federal circuits have adopted the test devised by the Second Circuit in *Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). That test requires that a trial court respond to a claim of a reporter's privilege by considering (1) the relevance of the information requested to the relief sought; (2) whether the party seeking disclosure has exhausted alternative sources; (3) whether the information sought goes "to the hearing" of the plaintiff's claim; and (4) the type of controversy at issue. *See Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Baker v. F. & F. Investment Co.,* 470 F.2d 778 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, *reh'g denied,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Other courts have expanded the number of factors specified in *Garland, see Mitchell v. Superior Court, supra,* or have left the factors unspecified, *see Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980).

*Taylor* required him to deny a motion to compel: "I recognize that little or no salutary purpose is served by a rule of law which permits the media defendant to thwart discovery by hiding behind the veil of possible secondary sources, but I am bound in this diversity action to follow Pennsylvania law as it has been construed by the Court of Appeals and Pennsylvania's highest tribunal". *Lal v. CBS, Inc., supra* at 366.

■ Were *Taylor*, and the Shield Law as amended after *Taylor*, not binding upon us, we should construe the term "source of any information" in 42 Pa.C.S. § 5942(a) to refer only to persons, and not to documents. On this interpretation, the Shield Law would protect only material in which a confidential source is revealed, or through which, in the reporter's judgment, it might ultimately be revealed. Just such an analysis underlies Judge GREENBERG's careful order in *Hatchard*, for he ordered disclosure only of the outtakes, while at the same time shielding such material as would "reasonably lead" to the disclosure of confidential sources. Judge BROMINSKI, however, in *Lefkoski*, made no such inquiry into whether the documentary material he ordered disclosed might actually or potentially reveal the identities of confidential sources. Accordingly, we should have affirmed Judge GREENBERG's order, but reversed Judge BROMINSKI's. *Taylor*, however, and the Shield Law as amended after *Taylor*, preclude us from reaching this result. On both appeals, the orders are reversed and the cases are remanded for proceedings consistent with this opinion.[15]

WICKERSHAM, BROSKY, OLSZEWSKI and BECK, JJ., join in this opinion.

TAMILIA, and CIRILLO, JJ., file dissenting opinions.

15. Since we reverse the orders on the basis of a statutory privilege, we need not and do not reach appellants' claims that the materials at issue are also protected under the Federal and State Constitutions.

WIEAND, J., files a dissenting opinion which was joined by ROWLEY, J.

SPAETH, President Judge, wrote this opinion before the expiration of his term on the court.

TAMILIA, Judge, dissenting:

I dissent and would affirm the orders of the lower courts. The two appeals, which were consolidated for argument, present the same issue as to the production of television materials on motion by plaintiffs in defamation actions. In one, the trial court granted appellee/Hatchard's motion to compel production of outtakes,[1] but denied his request for other documentary material. In the other, appellee, Lefkoski's motion to compel production of reporter's notes and other documentary material, as well as outtakes, was granted.

The majority would reverse, and reluctantly hold that despite the injustice of applying *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), the concept of appellate review which limits an intermediate appellate court from going beyond stated law enunciated by the Supreme Court, prevents us from correcting the injustice.

I believe this analysis, as exhaustive and persuasive as it may appear, avoids the clear balancing of individual rights as opposed to media rights under the first amendment, and the clearly distinguishable factual and legal considerations between *Taylor* and the cases subject to these appeals.

The issues for our determination are whether the Pennsylvania Shield Law or the first amendment to the United States Constitution accords appellants, Westinghouse Broadcasting Company and its affiliate KYW–TV 3 and NEP–TV News, the privilege of withholding from appellees, George Hatchard and Mt. Pocono AMC/Jeep, Inc. and Zigmond Lefkoski, the outtakes and other documentary materials ordered to be produced. I would find that neither the Pennsylvania Shield Law nor the first amendment to the

---

1. "Outtakes" are nonconfidential, non-broadcast portions of film or videotape "shot" in preparation for a news broadcast.

United States Constitution privileges appellants from relinquishing the outtakes in both cases and the documentary material requested by Lefkoski and affirm the lower court's orders.

## Background

In January and in March of 1979, appellant/KYW–TV3 broadcast investigative reports of its I–Team entitled "Wheeling and Dealing with City Hall" and "Follow to Wheeling and Dealing with City Hall". These reports concerned appellees' sale of millions of dollars' worth of automobiles to the city of Philadelphia and the propriety of the business relationship between appellees and the city. Numerous individuals, including appellee, George Hatchard, gave taped interviews to I–Team reporters, and edited portions of the interviews were broadcast on KYW–TV 3. On November 7, 1979, appellees commenced suit against appellants alleging that the broadcast reports were defamatory. Appellees subsequently amended their complaint (on January 27, 1981), and appellants filed an answer denying that appellees were defamed and maintaining that the broadcasts were accurate and truthful.

On November 16, 1979, appellees filed a request for production of documents seeking the unedited portions of all tapes, film, transcripts and memoranda prepared during the I–Team investigation. Appellants objected to this request maintaining that they were privileged from disclosing the documents under the Pennsylvania Shield Law, 42 Pa.C.S.A. § 5942(a)[2] and under the United States and Pennsylvania Constitutions. On February 3, 1981, appellees filed a motion to compel production, which the lower court denied without prejudice. On May 21, 1981, appellees filed a second request for production seeking "[a]ll tapes, film, transcripts, memoranda, etc..., prepared during the I–Team investigation of Mt. Pocono AMC/Jeep, ..., excluding

2. Act of July 9, 1976, P.L. 586 No. 142 § 2; 42 Pa.C.S.A. 5942(a). This is substantially a re-enactment of Act of June 25, 1937, P.L. 2123 No. 433, § 1, as amended December 1, 1959, P.L. 1669, § 1, as amended July 31, 1968, P.L. 858, § 1, 28 P.S. § 330.

any such material that would reveal the identity of your sources pursuant to 42 Pa.C.S.A. § 5942." The request also sought "[a]ll tapes, film, transcripts, memoranda, etc...., prepared during [appellants'] interviews ..." with twelve named individuals, except any "... material referred to by those individuals which would, in turn, reveal the source of other material [appellants] deem privileged." Appellants filed an objection to the request for production of documents reasserting its position that they were privileged under the Pennsylvania Shield Law and under the United States and Pennsylvania Constitutions. Appellees then filed a motion to compel production of documents, which was granted by the lower court on February 11, 1982. The lower court entered an order requiring appellants to produce the following:

1. All tapes, film, transcripts, memoranda, etc., prepared by the I–Team, of statements by or interviews with Plaintiff, George Hatchard.

2. All tapes and/or film prepared by the I–Team, of statements by or interviews with the following:

 a. William Klenk
 b. Hillel Levinson
 c. Carl Biegler
 d.* Richard Wills
 e. Bob Mindlin
 f. Francis Rizzo
 g. William Taylor
 h. Ben Wolf

In responding to items 1 and 2, Defendant shall not be required to produce any material where another source is revealed or where the material contains information which could reasonably lead to the disclosure of another source by the primary source (the people listed above). Plaintiff's request for the production of transcripts, memoranda or other notes prepared by the Defendants in

---

* Our reading of the record indicates that this individual is named Richard A. Will.

conjunction with their interview of the above individuals is denied.

The instant appeal is from this Order. Preliminarily, appellees challenge our jurisdiction, and I think it appropriate to comment briefly on the propriety of our reviewing the merits of the issues presented here.

The lower court refused appellants' request to certify its ruling for interlocutory review pursuant to 42 Pa.C.S.A. § 702(b) and Pa.R.A.P. 312, 1311 and 1312. Appellants filed a petition for a writ of prohibition or mandamus on June 11, 1982, at No. 169 Miscellaneous Docket No. 13 seeking to prevent the lower court from ordering appellants to comply with the production request of appellees. Speaking through President Judge Spaeth, our Court found that it would be inappropriate to issue either a writ of prohibition or mandamus since the lower court does not abuse or act beyond its jurisdiction simply because it issues an order that one party maintains is not supported by law. *Compare Schlesinger Petition,* 367 Pa. 476, 81 A.2d 316 (1951) and *McNairs Petition,* 324 Pa. 48, 187 A. 498 (1936) *with West Penn Power Company v. Goddard,* 460 Pa. 551, 333 A.2d 909 (1975). Where the lower court refuses to certify its ruling for interlocutory review, the appropriate course is a petition for review. Pa.R.A.P. Chapter 15. *See* comment, Pa.R.A.P. 1311. Although appellants did not proceed in this manner, we regarded the petition as what it should have been—a petition for review. Pa.R.A.P. 1503. So regarded, it was granted. The lower court should have certified its ruling for interlocutory review because the issue here involves a controlling question of law as to which there is substantial ground for difference of opinion. To await the entry of a final order as might be entered would be impractical as it is apparent that the issues' immediate resolution would materially advance the ultimate termination of the case. Pa.R.A.P. 1312(a)2. As there is no rule or statute placing a time limit on the filing of a petition for review from the judicial order in question, our exercise of discre-

tionary power to consider the merits of the instant appeal of an interlocutory order is proper. *See* Pa.R.A.P. 1512(c).

On May 28th and May 29th, WNEP–TV, Channel 16 News (NEP), broadcast a news report which appellee/Lefkoski alleges conveyed the impression that Lefkoski's auto repair business, "Ziggy's South Wilkes-Barre Auto Body Shop", had engaged in questionable business practice. Appellee sued NEP on June 25, 1984, and on July 23, 1984, he requested, prusuant to Pa.R.C.P. 4009, that NEP produce the following:

1. All writings, photographs, tapes, films, scripts, sound reproductions, records, editorial records, and other compilations of data of, concerning or relating in any way to the following:

a. Any investigation or investigations made by the defendant concerning the plaintiff and/or plaintiff's business, known as Ziggy's South Wilkes-Barre Auto Body Shop, Rear 611 South Main Street, Wilkes-Barre, PA 1870 [*sic* ].

b. Any information which on or before May 29, 1984 became known to the defendant concerning the plaintiff and/or plaintiff's said business.

c. The interview conducted on or about May 23, 1984 by agents and/or employees of the defendant with the plaintiff at the aforesaid place of business of the plaintiff.

d. The complete television news broadcasts transmitted by the defendant on May 28, 1984 and May 29, 1984 and in which the said broadcasts included any reference whatever to the plaintiff and/or plaintiff's said business.

e. The anchor-intro to the aforesaid television news broadcasts.

f. The teases to the aforesaid television news broadcasts.

g. All matters edited from and/or omitted from the final form of the aforesaid interview and television news broadcasts.

NEP refused and after a motion to produce and hearing, the court issued the following order:

NOW, this 21 day of February, 1985, at 9:10 o'clock, A.M., it is hereby ORDERED, ADJUDGED and DECREED that, consistent with the annexed Decision, Defendant shall respond to the Request of Plaintiff for Production and Inspection of Documents in possession of Defendant under Pa.Rule of Civil Procedure 4009, within thirty (30) days from the date of this Order.

An interlocutory appeal, properly filed pursuant to 42 Pa. C.S. § 702(b), was granted on May 7, 1985.

## Pennsylvania Shield Law

At common law, reporters had no right to remain silent when asked to divulge information given to them in confidence. *See,* 8 Wigmore § 2286 (McNaughton rev. 1961). Pennsylvania abrogated this common law rule by legislative enactment privileging a newspaper publisher or reporter to withhold the identity of sources of information. The current version of the Shield Law, 42 Pa.C.S.A. 5942(a), provides:

Confidential communications to news reporters

*No person* engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, *shall be required to disclose the source* of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit. (emphasis supplied)

The Pennsylvania Shield Law was enacted to protect the identity of an informant and confidential communications between that informant and the reporter.[3] This legislation would necessarily foster the free flow of news to the public inasmuch as it would encourage individuals to divulge infor-

3. *See* Comment, 77 Harv.L.Rev. 556 (1964); Comment, 112 Pa.L.Rev. 438 (1964); *see also In re Taylor,* 412 Pa. 32, 45, 193 A.2d 181, 187 (1963) (Cohen, J., dissenting).

mation who might otherwise not do so absent assurances of confidentiality.

Recently in *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *appeal pending*, —— U.S. —— 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985), the Pennsylvania Supreme Court reiterated that the Shield Law is "designed to protect the confidentiality of the source." The court stated that "sources are excludable whether or not they contain the identity of sources actually used by the newspaper since the identity of all persons named or implicated in these sources is also within the protection of the 'shield law'." *Id.* at 328, 485 A.2d at 387.

Instantly, appellants do not contend that the discovery request for documentary materials or outtakes is irrelevant, though they do urge that the information sought can be garnered by other discovery tools. Instead, appellants assert that as a matter of Pennsylvania law, the materials ordered to be produced, that may reveal a source of information, are absolutely privileged under the Pennsylvania Shield Law. With this assertion we cannot agree, since appellants do not consider the countervailing *fundamental* right to the protection of one's reputation provided by the Pennsylvania Constitution, Article 1, Declaration of Rights, Sections 1, 11. *See Wolfe v. Beal*, 477 Pa. 477, 480, 384 A.2d 1187, 1189 (1978); *Moyer v. Phillips*, 462 Pa. 395, 400, 341 A.2d 441, 443 (1975). *See also, Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952); *Meas v. Johnson*, 185 Pa. 12, 39 A. 562 (1898); *In re Sharpe*, 248 Pa.Super. 74, 88–89, 374 A.2d 1323, 1338 (1977) (Spaeth, J., concurring and dissenting); *Commonwealth v. Swallow*, 8 Pa.Super. 539 (1898).

The seminal case and only Pennsylvania appellate decision applying the earlier version of the Shield Law is *In Re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963).[4] The *Taylor* Court

4. The version of the Shield Law, 28 P.S. § 330, in effect in *Taylor* provided:

No person, engaged on, connected with, or employed by any newspaper of general circulation as defined by the laws of this

gave the Shield Law a broad interpretation, although it did so in the context of a grand jury proceeding.

*Taylor* arose out of a grand jury investigation in November, 1962, into alleged criminal activity in Philadelphia city government. Among those questioned was John Fitzpatrick, who revealed that he had given information to Philadelphia Evening and Sunday Bulletin reporters. Fitzpatrick had been questioned by the District Attorney's office in February, 1962, but the contents of the interrogation were not made public. On December 30, 1962, the Bulletin published an article entitled "Fitzpatrick's Secret Talk to D.A. is Barred" and revealed portions of the February interrogation to which the Bulletin had acquired access. The article stated that much of the District Attorney's "questioning dealt with what John Fitzpatrick had told Bulletin reporters." *Id.*, 412 Pa. at 36, 193 A.2d at 183. As a result, the grand jury issued a *subpoena duces tecum* on Robert Taylor, the president of the Bulletin and on Earl Selby, the paper's city editor. The subpoena directed them to produce before the grand jury all material, documents, and tape recordings relating to Fitzpatrick's disclosures to them and any material relating to independent investigations deriving from their discussions. Taylor and Selby appeared before the grand jury but refused to relinquish the requested material and documents and to answer certain related questions. They contended the Shield Law privileged them from disclosing the source of any information procured during the course of the preparation of the story. The lower court found them in contempt of court, and they appealed.

The Supreme Court expressly rejected the lower court's determination that the phrase "source of information", as

Commonwealth, ... for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any court, grand jury, traverse or petit jury, or any officer thereof, ...

The *Taylor* Court interpreted § 330 as also protecting radio and television stations. *Id.*, 412 Pa. at 41 n. 4, 193 A.2d at 185 n. 4.

used in the statute, includes only the identity of the person who disclosed the information, and it reversed the contempt citations. The term "source of information", according to the Court, "means not only the identity of the person but likewise includes documents, inanimate objects and all sources of information." *Id.*, 412 Pa. at 40, 193 A.2d at 185 (emphasis deleted). This construction, according to the Court, accords with its view of the Shield Law as being:

> [A] wise and salutary declaration of public policy whose spiritual father is the revered Constitutionally ordained freedom of the press. The Act must therefore, we repeat, be liberally and broadly construed in order to carry out the clear objective and intent of the Legislature *which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare* than the disclosure of the alleged crime or the alleged criminal.

*Id.*, 412 Pa. at 42, 193 A.2d at 185–86 (footnote omitted) (emphasis in original).

Thus, the court concluded that all the notes and recordings of Fitzpatrick's discussion with the Bulletin were protected by the Shield Law, except those portions of statements actually published or publicly disclosed. Although Fitzpatrick was the primary source of the information contained in the notes and recordings, *non* published information given by Fitzpatrick was protected because "the identity of many other persons may have been revealed in the questions and/or the answers." *Id.*, 412 Pa. at 43, 193 A.2d at 186. The Court's position was taken in response to the lower court's ruling that only the documents and recordings allegedly evidencing what Fitzpatrick had told reporters must be produced but with all the names deleted. This approach to balancing the interest of the public in the discovery of crimes with that of protecting the identity of confidential sources was apparently rejected by the Court as it stated:

If a Court can select or direct newsmen in its or their judgment to select or delete what information is disclosed by the informer or to furnish the documents in full with only the names deleted which the newsman or the Court sincerely believes should be deleted, the purpose, the object and the intent of the Act will be *realistically* nullified.

*Id.*, 412 Pa. at 43–44, 193 A.2d at 186 (emphasis in original). The Court did not distinguish between confidential and nonconfidential subpoena materials, nor did it limit its holding to only those materials that *would* reveal the identity of the confidential source. Instead, the Court concluded that the term "source of information" includes and thereby protects from compelled disclosure the identity of an informant, as well as documents and recordings. Only those statements made by the informant waived by actual publication or public disclosure by the reporter are not afforded protection under the statute. *Id.*, 412 Pa. at 44, 193 A.2d at 186.

By interpreting the phrase "source of information" as encompassing both the identity of the informant and the information itself, the *Taylor* Court adheres to the principal focus of the statute. The statute protects from disclosure the name of the informant and that information which would inferentially reveal an informant's identity.[5] But *Taylor* appears to go one step further. The Court suggests, even after the primary source is revealed, that the mere possibility that secondary sources could similarly be revealed by compelled discovery of information is sufficient to invoke the protection of the statute. This position is

---

5. *Accord, Hepps, supra*, 506 Pa. at 328, 485 A.2d at 387. In *Hepps*, the Supreme Court did not address the meaning of "source of information" although it appears certain that the outer boundary of protection would extend to information that would implicate the identity of the source.

 The court held that in a libel suit brought by a private individual for compensatory damages resulting from defamatory material, the presumption of falsity remains and the defendant has the option of proving truth as an absolute defense to the action under Pennsylvania law.

predicated on the assumption that judicial involvement in the administration of the privilege would compromise the editorial process and freedom of the press. The Court, in so holding, seemingly forecloses inspection of documents by a court in order to make an evaluation to assure the nondisclosure of primary or secondary sources and, likewise, court instruction to a media defendant to produce only those materials not revealing the same. Consequently, as appellants urge, the Shield Law as construed in *Taylor* privileges them from disclosing information in and of itself, except those portions actually published or publicly disclosed. Hence, a *carte blanche* privilege of nondisclosure of information is given to reporters, and waiver of that privilege by the reporter extends only to information "actually published or publicly disclosed and not to other statements made by the informer to the newspaper." *Id.*, 412 Pa. at 44, 193 A.2d at 186.

Appellants contend that the *Taylor* decision applies with equal force in the context of a libel action. *Taylor* has been analyzed in this setting.

In *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3rd Cir.1980), a case factually analogous to the cases *sub judice*, the Pennsylvania Shield Law was construed by the Third Circuit to accord protection to filmed outtakes sought to be produced in a defamation suit brought against WTAE–TV, a Pittsburgh station. WTAE–TV broadcast a news segment raising questions about the quality of meat sold by Steaks. During the broadcast, a portion of an interview conducted by a WTAE–TV reporter with Aubrey Mills, an employee of Steaks, was aired. Other Steak's employees were interviewed, but their names were not disclosed during the broadcast. Steaks, an Ohio based corporation, commenced a defamation suit against WTAE–TV in federal court based on diversity of citizenship. During pre-trial discovery, Steaks requested that WTAE–TV produce the outtakes of the Mill's interview that had not been included in the broadcast. Additionally, Steaks requested the outtakes of interviews of two customers whose identities had

not been disclosed. The Third Circuit court, applying Pennsylvania law, held that the Shield Law, as construed in *Taylor*, clearly protected the discovery of the outtakes of the interviews with the two customers whose identities had not been disclosed, since compelling production would reveal their identities as primary sources of information. More pertinent, the court construed *Taylor* as protecting all nonpublished portions of a source's statements from compulsory disclosure because of the *Taylor* concern that disclosure of statements not actually published or publicly disclosed might reveal the identity of secondary sources. *Id.* at 279.[6]

Appellants urge that *Taylor*, as construed in *Hepps v. Philadelphia Newspapers Inc.*, 3 Pa.D.C.3d 693 (1977) (lower court decision reversed on other grounds) and in *Steaks Unlimited*, erects an impenetrable barrier to the enforcement of the discovery order at issue here. However, neither *Hepps* nor *Steaks Unlimited* carry the force of binding precedent on this Court[7], and indeed, neither case heeds the fundamental right of reputation impressed upon the Pennsylvania Constitution. Inasmuch as the *Taylor* case arose in the context of a grand jury proceeding rather than in the setting of a libel action, it is not controlling here. The *Taylor* Court did not have before it a plaintiff seeking to vindicate his fundamental constitutional right.[8]

6. *See Lal v. CBS, Inc.*, 551 F.Supp. 364 (E.D.Pa.1982); *Mazzella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. 523 (E.D.N.Y.1979); *Altemose Construction Company v. Building and Construction Trades Council of Philadelphia*, 443 F.Supp. 489 (E.D.Pa.1977); *see also Pesavento v. Wilkes-Barre Independent Company*, 13 Pa.D. & C.3d 216 (1979).

7. We, of course, are not bound by a decision by an inferior state court, and federal decisions, while persuasive, do not carry the force of binding precedent on us. *Commonwealth v. Geschwendt*, 500 Pa. 120, 454 A.2d 991 (1982); *Radar v. Pennsylvania Turnpike Commission*, 407 Pa. 609, 182 A.2d 199 (1962).

8. The majority, in footnote 12, extensively discourses on the inapplicability of the constitutional privilege to protect ones reputation and the legislative right to restrict the judicial means to vindicate that right. For the reasons discussed infra, I would hold the defamation action was the legislative response to that constitutional right and the legisla-

Article 1, section 1 of the Pennsylvania Constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and *reputation,* and of pursuing their own happiness. (emphasis supplied)

The Pennsylvania Supreme Court has stated that the "protection of one's reputation is a *fundamental* right classified with life, liberty and property." *Moyer v. Phillips, supra,* (emphasis supplied); *see also, Wolfe v. Beal, supra; Matson v. Margiotti, supra; Meas v. Johnson, supra; In re Sharpe, supra; Commonwealth v. Swallow, supra.* The vindication and restoration of one's reputation is further etched into the Pennsylvania Constitution in article 1, section 7, the freedom of speech and press clause, and in article 1, section 11, the legal remedies clause. Article 1, section 7 provides:

The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, *being responsible for the abuse of that liberty.* (emphasis supplied)

Article 1, section 11 provides:

All courts shall be open; and every man for an injury done him in his lands, goods, person or *reputation* shall have remedy by due course of law, and right and justice administered without sale, denial or delay ... (emphasis supplied)

The former section assures that freedom of the press cannot preclude a defamation action and the latter section expressly recognizes a remedy to one whose reputation has

ture could not have intended that the media, apart from all others, was provided immunity from that action.

been injured. These provisions, then, make clear that the citizens of this Commonwealth enjoy a fundamental right in the protection of reputation, *see Moyer v. Phillips, supra,* and are given a remedy to right any wrong done to it. Accordingly, a limitation upon that remedy through the operation of a testimonial privilege must be scrutinized.[9] Where the operation of a testimonial privilege would deny a plaintiff the ability to pursue the vindication of his fundamental right through a defamation action to an extent that the right is impermissibly impaired or nullified, it cannot be condoned. Where there is a right and no remedy, there is no right. *See* 42 Pa.C.S.A. § 5101; Art. I, § 11, Pa. Constitution.

Severe barriers face appellees in the instant matter. Appellees must meet their burden of proving the defamatory character of the broadcasts and that the television audience understood the broadcasts as having a defamatory meaning.[10] Assuming that appellees can meet this burden, they must then, in a given situation, rebut appellants' assertion of qualified privilege by proving its abuse.[11] In order to establish abuse of qualified privilege, appellees must prove,

**9.** *See Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669, (1960) (Frankfurter, J., dissenting):

Limitations are properly placed upon the operation of this general principle [of no testimonial privilege] only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.

*See also* 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961).

**10.** 42 Pa.C.S.A. § 8343(a) provides:

(a) Burden of plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

*See Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971).

**11.** See note 9, supra.

dependent on their status as defamation plaintiffs, that the broadcasts were either maliciously or negligently made.[12] In particular, comparison of the film segments actually broadcast with outtakes possibly favorable to appellees, and undisclosed by appellants would be *crucial* in proving the requisite degree of constitutional fault.[13] *Compare Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 181, 191 A.2d 662, 669 (1963). Such a showing could have the effect of vitiating the assertion of qualified privilege by appellants. Appellants' contention that the Shield Law creates an absolute privilege of nondisclosure of outtakes that may reveal a source of information would effectively deny appellees the opportunity to vindicate their legal guarantee. *Taylor* cannot be construed as sanctioning such a result, and I believe such an interpretation would be impermissible as a matter of state constitutional law.[14]

**12.** 42 Pa.C.S.A. § 8344 provides:

> In all civil actions for libel, no damages shall be recovered unless it is established to the satisfaction of the jury, under the direction of the court as in other cases, that the publication has been maliciously or negligently made, but where malice or negligence appears such damages may be awarded as the jury shall deem proper.

**13.** As pointed out by the Supreme Court in *Hepps, supra,* 506 Pa. at 325 n. 13, 485 A.2d at 395, n. 13, in many cases as a practical matter the plaintiff will find it necessary to prove the *falsity* of the publication to establish the element of fault. Hence, a plaintiff's need for outtakes is even more real. While the documentary materials ordered to be produced in NEP would not present the same graphic contract between the published material, that which was withheld, the same rationale applies to the need for that information.

**14.** *Compare Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) where the Supreme Court held that an allegation of injury to reputation by a public official acting within the course of his duty, without official approval, failed to state a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment. The interest in reputation was neither "liberty" nor "property" recognized by federal law nor vouchsafed under the Kentucky Constitution. Although the Kentucky Constitution, Art. 1 § 14 parallels Pennsylvania Constitution, Art. 1 § 11, the Kentucky constitutional scheme does not make reputation a fundamental right. Pennsylvania does extend to its citizens a legal guarantee of present enjoyment of reputation. Art. 1 § 1. *See Moyer v. Phillips, supra; see also McKnight v. Southeastern Pa. Transp. Auth.,* 438 F.Supp. 813 (E.D.Pa.1977); *Reilly v. Leonard,* 459 F.Supp. 291, 296 n. 4 (D.C.Conn.1978).

Furthermore, I am convinced the *Taylor* Court would have recognized the inherent unfairness of a media defendant's asserting the defense of truth, when a libel plaintiff is required to prove the requisite degree of constitutional fault without crucial objective evidence from which the critical element of fault could be inferred. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) makes this point.

Noting that evidentiary privileges in litigation are disfavored,[15] the United States Supreme Court held that the first amendment to the United States Constitution is not to be construed as creating an absolute discovery privilege for materials implicating the "editorial process", i.e., materials that directly reveal the media defendant's subjective state of mind. *Id.* at 169, 99 S.Ct. at 1645, 60 L.Ed.2d at 129. *See Curran v. Philadelphia Newspapers, Inc.,* 497 Pa. 163, 175, 439 A.2d 652, 658 (1981). The Court emphasized that an individual's interest in his reputation is a "basic concern" and observed that a libel plaintiff would be severely hampered if direct evidence of the editorial process relevant to proving knowing or reckless disregard of truth was placed beyond his reach. *Id.* at 169, 99 S.Ct. at 1645, 60 L.Ed.2d at 129. The majority noted that foreclosing discovery of editorial processes would erect "an impenetrable barrier to the plaintiff's use of such evidence" and "is a matter of some substance, particularly when defendants themselves are prone to assert their good faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with 'convincing clarity'." *Id.* at 170, 99 S.Ct. at 1646, 60 L.Ed.2d at 130. This rationale applies when a libel plaintiff's burden is only to prove "some degree of culpability." *Herbert, supra* at 172, 99 S.Ct. at 1646, 60 L.Ed.2d at 131; *see also, Id.* at 174–76, 99 S.Ct. at 1648–49, 60 L.Ed.2d at 132–33. Moreover, punitive damages may not be recovered by a private figure plaintiff absent a showing of "actual malice." *See, Hepps, supra,*

15. *See* note 9, *supra,* quoted in *Herbert v. Lando, supra* at 176 n. 24, 99 S.Ct. at 1648 n. 24, 60 L.Ed.2d at 133 n. 24.

506 Pa. at 28, 485 A.2d at 388; *Purcell v. Westinghouse Broadcasting Co., supra*, 411 Pa. at 187, 191 A.2d at 672 (1963).

Indeed, the Supreme Court did not hold that it is unconstitutional as a matter of federal law for a *state* to establish a privilege against state of mind discovery through, as here, a Shield Law. Inquiry into the editorial processes vis-a-vis a comparison of outtakes with film actually broadcast could be absolutely foreclosed by legislative enactment, *absent* any countervailing constitutional right.[16] Appellants' construction of the Shield Law does as much. However, we do not think that the *Taylor* Court, presented with our facts, would have construed the Shield Law to permit this.[17] Appellees' right of reputation is more compelling than the public's interest in the discovery of crimes which was found insufficient to warrant piercing the reporter's shield in *Taylor*.

Furthermore, the Supreme Court in *Hepps* acknowledged that the Shield Law presented an obstacle to a plaintiff who finds it necessary to prove the falsity of the defamatory publication in establishing fault but noted that the Shield Law "was never intended to be interpreted as insulating the publisher from its negligence or actual malice." *Hepps, supra*, 506 Pa. at 328 n. 14, 485 A.2d at 387 n. 14.

Thus, we are led to conclude that a viewing of the outtakes would be an important means of determining appellants' culpability or innocence, and we think, a means least intrusive into the editorial process. No salutary purpose would be served by a construction of the Shield Law permitting a media defendant to avoid discovery and the truthfinding process by hiding behind the veil of disclosure of possible secondary sources, where the vindication of a libel plaintiff's constitutional right is at stake. Inasmuch as

---

**16.** *See Maressa v. N.J. Monthly*, 89 N.J. 176, 445 A.2d 376 (1982).

**17.** It does no good for the majority to maintain that the legislature in amending the Shield Law, subsequent to *Taylor*, to include broadcast media, incorporated *Taylor*, as we do not seek to overrule *Taylor* but to distinguish it.

the Shield Law was enacted to protect the identity of sources and the confidential communications between the source and the reporter, we fail to see that any purpose would be served by protecting from disclosure such nonconfidential material as was ordered to be produced by KYW and NEP here.

The lower court's order, carefully worded so as to assure no discovery of materials would be permitted that would lead to the disclosure of a primary or secondary source, accommodates the competing interests of the parties. A similar modification of the order in NEP (to eliminate possible discovery of identity of sources) would cure any possible infirmity in that order. However, for the reasons given below, even this careful procedure is not essential. Although there is language in *Taylor* suggesting that judicial involvement in the administration of the privilege would "realistically nullify" the Act, we can only conclude that participation by the lower court would be permissible given the reputation interest vouchsafed by the Pennsylvania Constitution. However, appellants urge that if the Shield Law does not protect them from compelled disclosure of the outtakes, then a limited privilege grounded in the first amendment does.

### First Amendment

Appellants argue the documentary material and outtakes ordered to be produced by the lower courts are protected by a qualified privilege emanating from a first amendment protection accorded the news gathering process.[18]

In *Branzburg v. Hayes*, et al., 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court held that the freedom of the press clause does not accord a reporter a privilege against testifying before a grand jury as to the identity of a source or as to confidential information, where

**18.** We note that appellants do not rely on the state guarantee of freedom of the press, article 1, section 7. This provision is construed as affording the press no greater freedom than its federal counterpart. *See McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973).

the inquiry is made in good faith and the information was relevant to the grand jury investigation. A close reading of *Branzburg* does, however, lead to the conclusion that a qualified privilege to safeguard confidential sources and confidential materials exists, since the privilege would further the first amendment interest in the free flow of news. The Pennsylvania Supreme Court has read *Branzburg* as creating a limited constitutional right to gather news. In *McLaughlin v. Philadelphia Newspapers, Inc.*, 465 Pa. 104, 110, 348 A.2d 376, 379 (1975), the Court quoted from *Branzburg:*

> 'Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated. *Id.* at 681, 92 S.Ct. at 2656, 33 L.Ed.2d at 639 (Opinion of the Court, per White, J.).'

> . . . .

> 'No less important to the news dissemination process is the gathering of information. *News must not be unnecessarily cut off at its source,* for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist.' *Id.* at 728, 92 S.Ct. at 2673, 33 L.Ed.2d at 667 (Stewart, J., dissenting). (emphasis supplied).

*Accord McMullan v. Wohlgemuth*, 453 Pa. 147, 162–63, 308 A.2d 888, 896 (1973), appeal dismissed 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974).

However, the right to gather news protected by the first amendment is not absolute, and the right of the press to gather news must yield to a showing of a paramount state interest. *McLaughlin v. Philadelphia Newspapers, Inc., supra; McMullan v. Wohlgemuth, supra; see also Petition of Daily Item*, 310 Pa.Super. 222, 234, 456 A.2d 580, 587 (1983); (Beck, J. concurring).[19]

---

**19.** In *McLaughlin,* the court balanced the press's right to acquire impounded court records of a disciplinary proceeding against the

As a threshold matter, we need not belabor our view expressed in the first part of this dissent, that the interests of a libel plaintiff are sufficiently compelling and a matter of weighty governmental interest warranting a consideration of the competing interests. *See Wolfe v. Beal, supra; Moyer v. Phillips, supra.* The United States Supreme Court in *Herbert v. Lando, supra,* reaffirms the view that the interests of an allegedly defamed individual are important ones. Furthermore, we think there is a paramount public interest in the fair administration of justice bottomed on the ascertainment of truth, though the interests competing here are not between government and the press but between private litigants and the press. *Compare Branzburg, supra,* and *Garland v. Torre,* 259 F.2d 545 (2nd Cir.1958), cert. denied 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958) *with Carey v. Hume,* 492 F.2d 631 (D.C.Cir.1974), cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974).[20]

state's interest in preserving the expectation of privacy and confidentiality accorded a private attorney made the subject of a disciplinary hearing. The court held "the freedom of the press is not violated by denying the [newspaper] access to court records of a disciplinary proceeding against a private lawyer, now in public office, concerning matters which were non-criminal and non-governmental in nature, for such proceeding was conducted with the expectation that it would remain confidential and an impoundment order was duly entered in accordance with standard practice, and where the lawyer involved desires that the confidentiality be maintained." *Id.,* 465 Pa. at 119, 348 A.2d at 383. In *McMullan, supra,* the press's desire to acquire names and addresses of welfare recipients was balanced against the court's desire to maintain the welfare recipients' right to privacy as reflected in the Public Welfare Code. The court found that the privacy of the welfare recipient outweighs any non-absolute right of the press to gather news and upheld the statutory ban against disclosure of names and addresses of welfare recipients. *Id.,* 453 Pa. at 165, 308 A.2d at 897. The court declined to hold that the press had a constitutional right of access to the names and addresses.

20. In *Garland v. Torre, supra,* an Opinion written by Circuit Judge Stewart, later Justice Stewart, singer, Judy Garland, sued Columbia Broadcasting Systems, Inc. for defamation which was based on a newspaper column written by columnist, Torre, attributing the allegedly defamatory remarks to an unnamed CBS executive. In an attempt to learn the name of the unnamed executive, proceedings were commenced to compel Torre to answer. The Second Circuit upheld the District Court's contempt sentence. The court held the

In the instant cases, the cogent argument for the application of a qualified privilege is that the dissemination of information to the public would flow less freely if the press's confidential communicants were not assured of their anonymity, or if information revealing their identities was disclosed. The core of this argument is challenged in the present context since the outtakes and documentary materials ordered to be produced are non-confidential in nature and their production would have a scant effect, if any, on the media's right to gather information. Of those nine named individuals in the lower court's order in KYW, none are confidential sources, and all but two appear in the KYW–TV broadcasts.[21] In NEP, the demand for outtakes is even more limited in that the only outtakes requested are from recorded interviews with the appellee. Hence, the interest of appellants in maintaining the confidentiality of sources is not compelling when placed beside appellees' need for the outtakes in order to vindicate their reputation interest. In these cases, there is not need or interest in the source of the reports as the information sought concerns the state of mind of the appellants and not the source of their information. The scope of a privilege should be limited by the purpose that it serves. *See e.g., Roviaro v. U.S.,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Appellants, however, insist appellees must demonstrate the relevancy, materiality and necessity of the documentary material and outtakes prior to disclosure in order to strike a proper balance of the competing interests here. *See e.g., Riley v. City of Chester,* 612 F.2d 708 (3rd Cir.1979). We concur that inquiry into a reporter's confidential sources or

press's first amendment interest must yield to the paramount public interest in the fair administration of justice. The court emphasized that the identity of the source of the allegedly defamatory remarks went to the heart of Garland's claim. In *Carey v. Hume, supra,* the D.C. Circuit affirmed the District Court's order directing the defendant newsman to disclose the source of information upon which his allegedly defamatory newspaper article was based.

21. Ben Wolf and Francis Rizzo are named in the lower court's order and neither appeared on the broadcasts. There are no outtakes to be produced regarding them.

confidential materials would require a court to examine closely the relevancy, materiality and necessity of the discovery request, as well as view such discovery request in light of the nature of the proceeding and the status of the reporter in the subject lawsuit. Such inquiry is not necessary here. The instant cases do not place a defendant's sixth amendment right to compel testimony against the press' first amendment interest. *See Branzburg, supra.* Nor does it involve a civil action where a non-party journalist is compelled to reveal a confidential source. *See e.g., Riley, supra; Silkwood v. Kerr-McGee Corporation,* 563 F.2d 433 (10th Cir.1977); *Baker v. F & F Investment,* 470 F.2d 778 (2nd Cir.1972), cert. denied, 411 U.S. 966, 99 S.Ct. 2147, 36 L.Ed.2d 686 (1973) (identity of source did not go to heart of appellant's case); *Garland v. Torre, supra* (identity of source went to heart of libel claim); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197 (N.D. 711 1978). Nor does it involve a case where the news gatherer is a party defendant in a libel suit and the disclosure of the identity of a confidential source is sought. *See e.g., Bruno & Stillman, Inc. v. Globe Newspaper Company,* 224 Ct.Cl. 583, 633 F.2d 583 (1st Cir.1980); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir. 1980), cert. denied 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Carey v. Hume, supra; Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972), cert. denied 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Dow Jones & Company, Inc. v. Superior Court,* 364 Mass. 317, 303 N.E.2d 847 (1973).

Instead, the instant case involves the discovery of non-confidential materials and outtakes in a libel suit against a defendant newsgatherer where the veracity of the newsgatherer's information is directly at issue. As *Herbert v. Lando, supra* makes plain, the editorial process is not immune from scrutiny so long as the requested information is not "merely to satisfy curiosity or to serve some general end as the public interest", but rather involves a "specific claim of injury arising from a publication that is alleged to

have been knowingly or recklessly false." *Id.* at 174, 99 S.Ct. at 1648, 60 L.Ed. at 132-33. This test is met here.

Therefore, I would hold appellants are not privileged under the first amendment to withhold the outtakes ordered to be produced.[22]

## CONCLUSION

I would hold appellants are not privileged to withhold the documentary materials and outtakes under the Shield Law. I would also hold appellants are not privileged to withhold the documentary materials and outtakes under the first amendment.

The lower court's orders accommodate the countervailing interests of the parties to this appeal. The orders have no deleterious effect upon the press's function nor upon its interest in maintaining the confidentiality of its sources. Appellees, on the other hand, will be given a legitimate opportunity to vindicate their rights. Compliance with the order is premised on the good faith of appellants and at this time necessitates neither an in camera inspection by the lower court nor other measures to ensure compliance. I would affirm the orders of the lower courts.

CIRILLO, Judge, dissenting:

I respectfully dissent. In so doing, I adopt the dissenting opinion of Judge Wieand; I also wish to point out some further considerations.

Like my brethren, I am fully aware of our subordinate role as an intermediate court. Certainly, we are not free to haphazardly distinguish a controlling case from the one before us simply because we might blanch at the outcome of its application as precedent. If stare decisis is to remain

22. That part of the lower court's order compelling the production of "... transcripts, memoranda, etc., prepared by the I–Team, of statements by or interviews with plaintiff, George Hatchard ..." merely duplicates the production of the outtakes. We consider this part of the order as surplus.

a viable stabilizer in our decision making process, this Court must abide whenever possible by Supreme Court mandates.

However, it does not follow that a potentially controlling decision may not be distinguished when it cannot be reconciled with other important changes in the law. The majority ably discusses the difficulty a defamation plaintiff faces in proving his case in light of *New York Times v. Sullivan*'s "actual malice" standard. Realizing that this onerous burden is multiplied by *Taylor*'s broad interpretation of the Shield Law, my brethren nonetheless sadly conclude, in the name of judicial tidiness, that we may not distinguish *Taylor* merely because it is "old law". This conclusion is based on two premises: a) *Taylor* was decided in 1963, yet in 1968 the Shield Law was amended without changing the language "source of any information", thus retaining its original meaning pursuant to 1 P.C.S. § 1922, and b) despite its vintage, *Taylor*'s holding has retained its vitality through recent federal court decisions which interpret Pennsylvania law.

The amendment to the Shield Law in 1968 brought employees of the wire services and electronic media within its purview; I interpret this as an intent to keep the law compatible with the ever-changing relationship between the media and its public. Further, 1 P.C.S. § 1922 also provides that the General Assembly does not intend an unreasonable result as a matter of statutory interpretation. Given the increased pleading burdens imposed by *New York Times v. Sullivan*, which was decided after *Taylor*, the Shield Law as interpreted in *Taylor* is now clearly unreasonable. In other words, I would distinguish *Taylor* not simply because it is old, but because other developments in the interim have stripped it of its precedential effect. Stare decisis is an important concept, but not an unyielding one.

Further, I do not agree that recent federal court reliance on *Taylor* has maintained the validity of that decision so far as this Court is concerned. The failure of those courts to distinguish *Taylor* based on its shortcomings does not negate the existence of the distinction. Decisions of lower

federal courts are persuasive, but are not binding upon us. *See generally* 1 Standard Pennsylvania Practice 2d § 2:131. To the extent we look to those cases for guidance, we might also look to those well-reasoned opinions in other jurisdictions which have either simply adopted more restrictive shield laws or explicitly rejected *Taylor* in doing so.

In sum, I conclude that the development in the law since *Taylor*, as recognized by the majority, constitutes an important distinction between that case and the one before us. Stare decisis was never intended as a vehicle for the perpetuation of bad law. I would affirm subject to the modification suggested by Judge Wieand.

WIEAND, Judge, dissenting:

I respectfully dissent. I would limit the holding in *In Re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), to the facts there before the Court and thus distinguish it from the facts of the instant case. The majority has made a good case for doing so; and, therefore, it is unnecessary to repeat the reasons here. It may be observed, however, that the same limitation upon *Taylor* has already been suggested by the Supreme Court when, in *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), it said that the Pennsylvania Shield Law "was never intended to be interpreted as insulating the publisher from its negligence or actual malice." *Id.*, 506 Pa. at 328 n. 14, 485 A.2d at 387 n. 14.

The broad interpretation placed upon *Taylor* by the majority must inevitably permit the media to suppress at will any and all "information" gathered but not published. Not only is such a result unwise—as the majority concedes—but it clearly was not intended by the legislature, whose sole purpose in enacting the Pennsylvania Shield Law was to protect the media against being required "to disclose the *source* of any information procured or obtained." 42 Pa. C.S. § 5942(a) (emphasis added).

I would affirm the order entered by Judge Greenberg in the *Hatchard* case. In the *Lefkoski* case, I would modify

the order to protect against the disclosure of appellant's "sources" and, as so modified, would affirm the order of Judge Brominski.

ROWLEY, J., joins this dissenting opinion.